(No. 49299.-

ST. PAUL FIRE & MARINE INSURANCE COMPANY,
Appellee, v. ROBERT U. FRANKART *et al.*—(Wilson
Freight Co., Appellant.)

*Opinion filed November 30, 1977.*

210

Westervelt, Johnson, Nicoll & Keller, of Peoria, and Smith & Loy, of Pontiac (Robert D. Jackson and Daniel L. Johns, of counsel), for appellant Wilson Freight Co.

McConnell, Kennedy, Quinn & Morris, of Peoria (R. Michael Henderson, of counsel), for appellee.

MR. JUSTICE MORAN delivered the opinion of the court:

The plaintiff, St. Paul Fire & Marine Insurance Company, filed a declaratory judgment action in the circuit court of Tazewell County against defendants, Robert U. Frankart (its insured), Wilson Freight Company (Wilson), and others. It sought to determine whether, under its policy, it was obligated to afford Frankart coverage. The circuit court entered judgment in favor of defendant Frankart, upon consideration of documentary evidence stipulated to by the parties. The plaintiff appealed, and the appellate court reversed. (45 Ill. App. 3d 29.) On petition of co-defendant Wilson, we granted leave to appeal.

Frankart was the owner and operator of a tractor and trailer which he leased to Wilson, a common carrier, under the terms of a lease dated April 8, 1974. The lease, in accordance with Interstate Commerce Commission (ICC) regulations, authorized Frankart, who did not possess a required ICC permit of his own, to transport freight in interstate commerce under Wilson's ICC permit. It further provided, *inter alia,* (1) that Frankart lease his equipment to Wilson for its "exclusive possession, control, responsi-

bility and use"; (2) that Frankart's equipment display Wilson's permit identification when in use under the lease; (3) that Frankart be allowed to sublease his equipment to another common carrier; and (4) that, during the duration of any sublease, Wilson's permit identification be removed. The lease also required that Frankart obtain, at his own expense, "bobtail and deadhead" insurance, as well as comprehensive insurance coverage. ("Bobtail" and "deadhead" are terms used in the trucking industry to mean, respectively, the operation of a tractor without a trailer and the operation of a tractor while pulling an empty trailer.)

To meet the lease requirement, Frankart obtained a combination automobile policy from the plaintiff, which policy included an endorsement entitled "Insurance for Non-Trucking Use." The policy endorsement stated:

> "It is agreed that such insurance as is afforded by the Policy for Bodily Injury Liability *** with respect to any automobile described below, or designated in the Policy as subject to this endorsement, does not apply: ***
>
> * * *
>
> (b) while the automobile or any trailer attached thereto is used to carry property in any business;
>
> (c) while the automobile is being used in the business of any person or organization to whom the automobile is rented.
>
> Description of Automobile:
>
> 1967 Peterbilt D/Tractor S 23478"

Because of the limited scope of the coverage, the annual policy premium for the year ending April 5, 1975, amounted to only $61 for bodily injury liability and $60 for property damage liability.

On June 6, 1974, with both the lease and the insurance policy in force, Frankart was involved in a collision between his tractor-trailer and a Greater Peoria Mass Transit District bus. The accident occurred in East Peoria, Illinois. Approximately a week before the accident,

Frankart had picked up a load of steel in Coatesville, Pennsylvania, as directed by Wilson. Frankart delivered the load under Wilson's ICC permit to its destination in Tulsa, Oklahoma, on June 5. Immediately thereafter, Frankart called Wilson's terminal in Granite City, Illinois, and was told that no loads were then available for him to transport in the direction of Wilson's home terminal in Cleveland, Ohio. Frankart then drove to Wilson's Granite City terminal, where he took his name off the availability list and departed, with an empty trailer, for his home in Findlay, Ohio. He deviated from the most direct route home in order to pass through East Peoria, where he could save on the price of fuel and where he might sublease with another carrier. As the truck was exiting Interstate 74 in East Peoria, and before Frankart had an opportunity to sublease, the accident occurred.

The issue before this court is whether the appellate court erred in concluding that the tractor-trailer was still being used in the business of Wilson at the time of the accident, thereby excluding coverage under the terms of the insurance policy.

The scope of the insurance coverage in this case must be construed in the context established by the ICC regulations which cover the leasing of owner-driven tractors by franchise carriers engaged in interstate commerce. The main thrust of the regulations is to prevent licensed carriers from escaping liability to injured members of the public by claiming that their lessor-drivers were independent contractors rather than employees. Prior to the regulations, an injured person could not fix financial responsibility on the licensed carrier without first establishing that the carrier had a right to control the lessor-driver's activities and that the lessor-driver was acting within the scope of his employment at the time of the accident. In a recent case, this court held that the purpose of the regulatory scheme was to eliminate such

issues and to impose vicarious liability on the licensed carrier "without regard to whether at the time in question [the tractor] was being used in the business of the [driver-] lessee." *Schedler v. Rowley Interstate Transportation Co.* (1977), 68 Ill. 2d 7.

The insurance policy in this case extends coverage to Frankart only for the limited instances in which his tractor is *not* being used in the business of any carrier-lessee. There is no evidence that either Frankart or the plaintiff intended to gauge Frankart's coverage by a regulatory scheme which fixes liability between carriers and injured members of the public. In this regard, the case at bar is similar to *Wellman v. Liberty Mutual Insurance Co.* (8th Cir. 1974), 496 F.2d 131, wherein a liability insurance policy was issued in behalf of an interstate carrier which leased trucks from various owner-drivers. The policy excluded coverage whenever the truck was "not being used exclusively in the business of" the interstate carrier. One of the owner-drivers collided with an automobile while the owner-driver was returning from a delivery which he had made for a carrier to whom he had subleased his truck. The court held that, although the interstate carrier would be liable under ICC regulations, the insurance policy did not afford coverage because the truck, under sublease to another carrier, was not being used exclusively in the business of the insured interstate carrier. In so holding, the court stated:

> "The language of the insurance policy must be given its ordinary meaning unless good reason appears for doing otherwise. The relevant I.C.C. regulation on insurance [citation] contains no provision which would require a motor carrier specifically to carry insurance affording liability coverage for judgments rendered solely against an owner-operator of a vehicle leased to the motor carrier. In the absence of such a provision, we

think it unreasonable to apply [the regulatory provision] and the public policies of the Interstate Commerce Act, as a gloss to the exclusionary provisions of the insurance policy in this case. We do not think that such broad coverage could reasonably have been contemplated by the parties when they formed their insurance contract. Nor should we make the unwarranted assumption that the insurer and the insured somehow intended the apparent and obvious meaning of the endorsement to be inoperative and to be controlled instead by an I.C.C. regulation which in no way relates to or binds insurance companies." *Wellman v. Liberty Mutual Insurance Co.* (8th Cir. 1974), 496 F.2d 131, 138-39.

In the case at bar, we find that the disputed insurance policy is ambiguous to the limited extent that it does not define "in the business of" to necessarily be the equivalent of the carrier's liability under ICC regulations. Because the insurance company prepared the policy, such ambiguity will be strictly construed against the insurer. *Canadian Radium & Uranium Corp. v. Indemnity Insurance Co.* (1952), 411 Ill. 325, 332; *Pre-Cast Concrete Products, Inc. v. Home Insurance Co.* (7th Cir. 1969), 417 F.2d 1323, 1325.

Absent any reference in the insurance policy to the ICC regulations, the term "in the business of" must be construed according to its recognized common usage in conjunction with the rest of the policy. Wilson contends that Frankart, in applying for "bobtail and deadhead" insurance, insured himself for any accidents occurring while the tractor was being operated without a trailer or while pulling an empty trailer. Section (b) of the policy endorsement excludes coverage whenever the tractor-trailer is hauling loads in any business. If this were the only provision in the endorsement, Frankart would have been

covered whenever he was "bobtailing" or "deadheading." However, section (c) further excludes coverage whenever Frankart's tractor is being used in the business of any lessee. Section (c) does not purport to exclude coverage only when a load is being hauled for the lessee. Such a reading would render section (c) totally meaningless next to the broader exclusion of section (b). It is a fundamental rule of construction that meaning and effect, if possible, be given to every part of a contract so that one provision is not construed to annul another. (4 Williston, Contracts sec. 618, at 715 (3d ed. 1961); 12 Ill. L. & Prac. *Contracts* sec. 215 (1955); *State Security Insurance Co. v. Goodman* (1972), 6 Ill. App. 3d 1008, 1012-13.) Applying this rule of construction, the policy clearly provides that coverage is excluded when Frankart's trailer is being used in the business of a lessee even if, at the time of the accident, the tractor is pulling an empty trailer.

The facts are not in dispute. The parties submitted the facts at trial by stipulation, seeking a determination as to whether Frankart's tractor was being used in the business of Wilson at the time of the accident. Although the trial court ruled that the tractor was not being used in Wilson's business, we are not bound by the trial court's determination. In *Puttkammer v. Industrial Com.* (1939), 371 Ill. 497, 500-01, the issue before this court was whether an injury resulting in death arose out of and in the course of plaintiff's employment. The facts were not in controversy and were, for the most part, stipulated. This court held that where the facts are not in dispute, their legal effect becomes a matter of law. Also see *Ayers v. Kidney* (6th Cir. 1964), 333 F.2d 812, which, on summary judgment as a matter of law, resolved an issue similar to the issue here.

The pertinent facts of this case follow. Wilson, a licensed interstate carrier, had 17 terminals scattered throughout the country. Owner-drivers, operating pursuant to a lease with Wilson, could report into any of the

terminals to obtain loads to haul under Wilson's ICC permit. Frankart customarily reported in to Wilson's terminal in Cleveland because it was near his home in Findlay, Ohio. An owner-driver might pick up a load at any of the terminals or he might be instructed by telephone to pick up a load in transit and proceed to the point of delivery without having to drive his tractor-trailer to a terminal. It was common practice for Wilson's owner-drivers to deliver a load and either to report to a nearby terminal for another load or to return home and call in to the terminal nearest his home for the next assignment.

After delivering a load in Tulsa for Wilson and being informed at Wilson's terminal in Granite City, Illinois, that no loads were available for him to haul in the direction of Wilson's home terminal in Ohio, Frankart continued his return trip home pulling an empty trailer. He drove north to East Peoria, where he could buy fuel at a low price and where he might be able to sublease to another carrier. Frankart testified in a deposition that the diversion through East Peoria was his usual route from Wilson's Illinois terminal to Ohio because of the price savings on fuel. Frankart's lease with Wilson provided that Frankart pay his own fuel costs.

Wilson admitted, through the deposition testimony of its vice president, James Marck, that owner-drivers were free to choose their own routes as long as they stayed within the designated routes assigned to Wilson in its ICC permit. Marck also testified that Wilson did not instruct owner-drivers as to where they should eat, sleep, rest, or buy fuel along the routes. Other than the lease, which provided in part that Wilson had the "exclusive possession, control, responsibility and use" of Frankart's tractor and trailer during the one-year term of the lease, no written policies or procedures were maintained to limit or direct Frankart's use of his tractor or trailer in Wilson's business.

Wilson admitted, again through the deposition testimony of its vice president, that an owner-driver would be using his trailer in Wilson's business while he was en route to pick up a load assigned by Wilson or while he was returning to a Wilson terminal after hauling a load. On both such occasions, the owner-driver would likely be pulling an empty trailer. Wilson argues, however, that once Wilson informs an owner-driver that no loads are immediately available and the owner-driver chooses to return home in his tractor to await subsequent assignment, he is no longer using the tractor in Wilson's business. Wilson contends that Frankart's diversion to East Peoria further evidences that Frankart was driving his tractor for personal use and not in Wilson's business. We do not agree.

Wilson's failure to have another assignment for Frankart at its Illinois terminal did not terminate its "exclusive possession, control, responsibility and use" of Frankart's tractor-trailer provided under the lease. It is the nature of Wilson's business that its owner-drivers will be relieved of a load at a point of delivery, and that, unless another load can be picked up on the return trip, the owner-drivers must make their return trip pulling an empty trailer. As Wilson's vice president conceded, the original assignment does not terminate at the point of delivery. We find that it continues at least until the owner-driver returns to the point where the haul originated (Coatesville, Pennsylvania), to the terminal from which the haul was assigned (Cleveland, Ohio), or to the owner-driver's home terminal from which he customarily obtained his next assignment (Findlay, Ohio). Neither can it be inferred from Frankart's route through East Peoria to buy fuel that the vehicle was no longer in Wilson's business or that it was being put to Frankart's personal use. Wilson permitted its owner-drivers to choose where they would purchase fuel. Had Frankart chosen to buy the fuel in East Peoria in the course of hauling the load to Oklahoma, Wilson could not

have claimed that Frankart was no longer using his tractor-trailer in Wilson's business. We find, as a matter of law, that during Frankart's return trip to his home in Ohio, his tractor-trailer continued to be used in Wilson's business.

Finally, Wilson asserts that even if the insurance policy is construed to exclude coverage, the plaintiff should have been estopped from denying coverage because it delayed notifying Frankart of its denial of coverage. We question whether Wilson has standing to raise this issue in Frankart's behalf, but, nonetheless, we elect to consider the issue on the merits.

The party injured in the collision filed suit on August 2, 1974. On August 19, the plaintiff received the summons and complaint. On September 18, less than a month thereafter, the plaintiff, by letter, advised Frankart that it reserved all rights which it had to deny coverage. The plaintiff promptly instituted the declaratory judgment action while providing Frankart a defense, with a different counsel, in the original action. Wilson cites *Zak v. Fidelity-Phenix Insurance Co.* (1966), 34 Ill. 2d 438, in support of its position. *Zak,* however, is easily distinguishable on the facts. There, the insurance company did not inform the insured of the denial of coverage until six months after judgment was entered against the insured and did not defend the insured in the original action. The court found that the delay was unreasonable and that it prejudiced the insured to the extent that it resulted in judgment against the insured and the loss of the insured's driving privileges. In the case at bar, Wilson offered no evidence that Frankart was prejudiced by the 30 days which elapsed before the plaintiff notified Frankart of its denial of coverage. The facts stipulated to by the parties indicate that the plaintiff acted with reasonable promptness in notifying Frankart. We find no basis in the record of this case to justify the application of the doctrine of

220

estoppel.

For the reasons stated, the judgment of the appellate court is affirmed.

*Judgment affirmed.*