AMERICAN INTERINSURANCE EX-
CHANGE, Plaintiff–Appellant,

v.

OCCIDENTAL FIRE AND CASUALTY
COMPANY OF NORTH CAROLINA,
et al., Defendants–Appellees.

No. 88–1488.

United States Court of Appeals,
Seventh Circuit.

Submitted May 9, 1988.*

Decided June 13, 1988.

Carl L. Steiner, Axelrod, Goodman, Stein-
er & Bazelon, Chicago, Ill., for plaintiff-ap-
pellant.

Barry L. Kroll, Williams & Montgomery,
Ltd., Chicago, Ill., for defendants-appellees.

Before FLAUM, EASTERBROOK and
MANION, Circuit Judges.

EASTERBROOK, Circuit Judge.

A trucking mishap has produced a dis-
pute about insurance coverage. Walter
Ragland, doing business as Ragland Truck-
ing, owned the offending truck; Daniel
Donnelly was driving the truck at the time;
Ragland, who lacked the certificates of
public interest, convenience, and necessity
needed to operate the truck in either inter-

* An earlier appeal, argued on October 30, 1987,
was dismissed for want of jurisdiction. 835
F.2d 157 (7th Cir.1987). After the parties filed a
stipulation of facts establishing that they are of
diverse citizenship, and the district court en-
tered a final judgment, the appeal was resubmit-
ted to the original panel on the briefs.

state or intrastate commerce, had signed leases with both Illinois Cargo, Inc., and Highland Transport, Inc. American Interinsurance Exchange insured Cargo; Occidental Fire & Casualty insured Ragland. American's policy covers a leased truck "while [it] is being used exclusively in [Cargo's] business as a trucker." Occidental's policy excludes accidents that occur while the truck "is being used in the business of any person or organization to whom the [truck] is rented." American contends that the truck was not being used "exclusively" in Cargo's business. Occidental, for its part, denies coverage because Ragland was devoting the truck to business other than Ragland's, and Occidental does not care whose.

After a bench trial on stipulated facts, the district court held that American's policy covers Cargo, Ragland, and Donnelly, and that Occidental's policy does not apply. The stipulation recited that the night before the accident, Ragland gave Donnelly the keys to the truck and told him to pick up straps suitable for securing tarpaulins to trailers. (The "truck" in question is a tractor; lessees supplied the trailers.) At 7:45 a.m. on April 9, 1984, Donnelly reported to Cargo. The truck had been parked nearby, in a space Ragland rented from D & M Enterprises (an unrelated party), since March 16. D & M's lot is behind Ragland's house and next to Cargo's yard. Richard Benoit, Cargo's president, told Donnelly that no load was available. Benoit did not say whether there would be loads later. Cargo had never used Donnelly as a driver, however, and Benoit had hinted to Ragland that he never would. Benoit may have been prescient, for within minutes after Donnelly drove off in search of straps, the tractor was involved in a multi-vehicle crash. Three suits have been filed in Illinois courts as a result.

■ The lease between Ragland and Cargo, dated November 21, 1983, and running for three years, recited that it was made under the authority of the Illinois Commerce Commission. Illinois permits leases by the trip. Its rules, 92 Ill.Adm.Code § 1360.40(c), require the lease to transfer exclusive possession and authority only "during such periods as the equipment is operated by or for [the certificate holder] as the lessee". Truckers must file a lease for every trip; it is a convenient and lawful alternative to file a master agreement that covers all trips for a maximum of three years. The Interstate Commerce Commission, which regulates interstate truck transportation, requires leases to cover blocks of time rather than specific operations. 49 C.F.R. § 1057.12(c)(1) (requiring exclusive possession and control for the "duration of the lease", without the qualification related to operation). The Ragland–Cargo lease states in part:

> For the duration of this lease LESSOR leases Equipment to LESSEE for LESSEE'S exclusive possession, control, use and responsibility during the periods the vehicle is operated by or for the lessee.

In claiming that American's policy applies, Cargo and Occidental emphasized that the lease puts the truck in Cargo's "exclusive possession"; American replied that the "exclusive possession [and] control" lasted only "during the *periods* the vehicle is operated by or for" Cargo, and it pointed out that there may be other periods, as the lease also provides:

> Nothing herein shall be construed as preventing the LESSOR from entering into a subsequent Lease of the same equipment during the duration of this Lease....

In other words, Ragland could (and did) lease the truck to more than one holder of operating authority, implying that "exclusive possession [and] control" took place only during the operation by a given lessee: the holder of the operating authority had to have exclusive control while *its* authority was in use, but different lessees could have control on different trips, and between trips Ragland might have control. Ragland's son testified in a deposition—there appears to be no dispute on the point—that Ragland treated the truck as available by the trip, and that when Cargo did not have a load, Ragland would try to find someone who did. On this view, the Ragland–Cargo lease simply avoided the need to file a

multitude of single-trip leases with the Illinois Commerce Commission.

Starting from the premise that the Ragland–Cargo lease is a master agreement covering trips, rather than a single time lease, American argued that Cargo was not using the truck (exclusively or otherwise) when the collision occurred. Cargo had not used Ragland's services since March 16 and had never accepted Donnelly as a driver; on April 9 Benoit had said that there was nothing for Donnelly to haul; Donnelly headed off on an errand for Ragland, to buy straps that would be of aid to Highland or any other lessee; Donnelly did not ask for or receive Benoit's permission to move the truck, but simply used the keys Ragland had provided; Donnelly did not need Cargo's permission, because he was not moving freight on the authority of Cargo's certificates; for all Cargo knew, Donnelly's next stop after buying the straps would have been Highland's yard. So, American insisted, its policy does not apply, for it says:

> The owner or anyone else from whom **you** [Cargo] hire or borrow a covered **auto** [powered vehicle] which is a **trailer** is an **insured** while the **trailer** is connected to another covered **auto** which is a power unit, or, if not connected:
>
> a. Is being used exclusively in **your** business as a **trucker,** and
>
> b. Is being used pursuant to operating rights granted to **you** by a public authority.

(The boldface terms, thus in the original, are defined in American's policy.) Cargo and Occidental responded that the lease runs for three years, that Donnelly had reported to Cargo for work on April 9 and might well have returned (for he had not been told that no loads would be available all day), that the truck's last use was in Cargo's business, and that it displayed Cargo's name on a placard at the time of the collision. Highland's name and operating numbers also appeared on placards, but they had been covered by Cargo's.

The case as presented to the district court raised some factual issues that might have been important when deciding whether the truck was being used in Cargo's business at the critical moment. Did Benoit authorize Donnelly to get the straps? Did he plan to use the truck (with or without Donnelly as driver) in the near future? Where would Donnelly have gone after getting the straps? What portion of the truck's time was spent hauling Cargo's cargo? (If very high, that might suggest that the straps inevitably were for use in Cargo's business.) The answers to such questions could be important in determining whether Donnelly was on Cargo's business, Highland's business, Ragland's business, or some combination at the time—from American's perspective, any business other than Cargo's "exclusively" would defeat coverage. The district court did not address these questions, however. Instead it held that Illinois has a per se rule under which a lessor of a truck is deemed to be in the service of the lessee continuously until the driver returns to his "home terminal". For this it relied wholly on *St. Paul Fire & Marine Insurance Co. v. Frankart,* 69 Ill.2d 209, 13 Ill.Dec. 31, 370 N.E.2d 1058 (1977).

The driver-owner-lessor in *Frankart* leased his truck to Wilson, an interstate common carrier, under a time lease filed with the Interstate Commerce Commission. This permitted the owner to arrange subleases, but the implication of the lease (backed up by federal regulations) was that the truck was under the control of Wilson unless subleased. Wilson sent the owner to Pennsylvania to pick up a load of steel, which he hauled to Oklahoma. After delivering the steel, the owner called Wilson and learned that there was no load available for back-haul to Ohio, his home state. So he drove to Wilson's terminal in Illinois, empty, and took his name off the availability list before heading for home. While still in Illinois buying fuel (and perhaps investigating sublease possibilities), the owner had a collision. *Frankart* holds that St. Paul had to defend and indemnify both Wilson and the owner, on the ground that the truck was being "used in the business of" Wilson when the accident occurred. The Supreme Court of Illinois observed that the truck was on the road by reason of

Wilson's business, in which it was engaged at least until it reached home base or the driver found another load to carry.

The district court inferred from *Frankart* a rule that a leased truck, once engaged, stays engaged until home. Ragland's truck sallied forth from Cargo's yard on April 9 and had not returned home; therefore, the district court held, it was still on Cargo's business. There are two problems with this approach. First, it overlooks a difference between interstate and intrastate leases. Wilson had rented the truck full time, unless the owner found a sublease; Cargo had rented Ragland's truck by the trip and had "exclusive" control only while the truck was on Cargo's business. Second, it begs the question: whether Ragland's truck embarked on Cargo's business. Ragland's truck had not *stopped* doing Cargo's work, to be sure, but unlike the case in *Frankart* there is doubt whether it had *begun*. Ragland's truck departed not from Cargo's yard but from D & M Enterprises' lot, in which Ragland had leased space. The lot was contiguous to Cargo's yard (and Ragland's home), but one person cannot transfer liability to another by choosing to park nearby. Even if we treat the case as one in which Donnelly drove the truck to Cargo's yard and then set off to buy the straps, it is doubtful that would make the foray part of Cargo's business. Cargo said it had no work. For all we know from the record, itinerant lessors such as Ragland may visit several yards in a day looking for work. It is most unlikely that the last operator seen before a crash is responsible, when the operator said only: "go away".

◼ Occidental contends that Ragland's truck has made several trips for Cargo in interstate commerce. Therefore, Occidental insists, the Ragland–Cargo lease must be governed by the Interstate Commerce Commission's rules, and Cargo, which used the truck on March 16, is the operator unless and until Ragland arranged a sublease—which he had not. American responds that the interstate trips were within the "Chicago Commercial Zone" (eastern Illinois and northwestern Indiana) and

hence exempt from federal regulation under 49 C.F.R. §§ 1057, 10526(b)(1). The district court treated the lease as one under state law, as was appropriate. An insurer bears only the risks assumed in the policy. Any insurer that examined the Cargo–Ragland lease would have read it as a master agreement covering a series of trip leases, a reading that affects the risk assumed. That Cargo and Ragland may have violated both state and federal rules by transporting interstate cargo without necessary documents might have exposed American to extra risk during such a shipment (when the truck was being used exclusively in Cargo's business), although clause (b)—limiting coverage to trips "pursuant to operating rights granted"—might prevent this. Ragland and Cargo could not, however, expand American's coverage to periods when Cargo was not using the truck but simply would have been deemed to be in control had there been a lease satisfying federal rules. American did not write such a policy, and coverage comes from the *policy* rather than from any offenses Cargo and Ragland may have committed against the regulatory network. *Travelers Insurance Co. v. Transport Insurance Co.*, 787 F.2d 1133 (7th Cir.1986); *Wellman v. Liberty Mutual Insurance Co.*, 496 F.2d 131 (8th Cir.1974); *Simpkins v. Protective Insurance Co.*, 94 Ill.App.3d 951, 50 Ill.Dec. 449, 419 N.E.2d 557 (1st Dist.1981).

The district court's rationale, based on *Frankart*, does not establish American's coverage. Whether any other line of argument might do so is doubtful, but the district court has the initial opportunity to examine the record and make the appropriate findings and conclusions. One question requiring careful attention on remand is whether American's policy covers Cargo even if not Ragland and Donnelly. Like the district judge, we have concentrated on the rules in part D.3 of the policy, captioned "WHO IS INSURED". Part D.3 makes the "owner or anyone else from whom **you** hire or borrow a covered **auto**" an "insured" if the other requirements (including exclusive use) are met. This language suggests that the policy might cover Cargo, the primary insured, even if it does

not cover Ragland and Donnelly. Of course, if the truck was not being used in Cargo's business, then Cargo will not be held liable in state court. But the duty to defend is broader than the duty to indemnify, so American may well have at least a duty to defend Cargo in the state case. The district court should consider this possibility if Cargo has not waived the argument.

The district court entered a declaratory judgment stating that American's policy covers Cargo, Ragland, and Donnelly, while Occidental's does not apply to the accident. American filed an appeal; Cargo, Ragland, and Donnelly neither filed a cross appeal seeking coverage from Occidental nor appeared to defend the judgment awarding them coverage from American—although American's brief insists that Occidental's policy provides coverage. When this case was here a few months ago, we pointedly reminded the parties that Cargo, Ragland, and Donnelly have a substantial interest in the litigation, for there is a distinct possibility that *neither* policy applies.

> American alone appealed. If we reverse on American's appeal, then *no* policy covers this accident. Occidental argues vigorously that American has no legal interest in obtaining a reversal of the judgment absolving Occidental of liability. It may be, as American argues, that *if* its policy applies, it has an interest in obtaining a declaration that Occidental's applies too—for then, American says, Occidental's policy is basic and American's is excess. But if we were to agree with American that its policy does not apply, then American would have no interest in a declaration that Occidental's does.... Even if American and Occidental have a "case or controversy" about the coverage of Occidental's policy, the appeal could end with a decision that neither applies.

835 F.2d 157, 159 (7th Cir.1987) (emphasis in original). We dismissed American's first appeal for want of jurisdiction. The district judge then entered a declaratory judgment wrapping up the case with respect to all of the parties—and Cargo, Ragland, and Donnelly were on the short end of the stick with respect to Occidental. Nonetheless, only American filed a notice of appeal. Cargo, Ragland, and Donnelly did not, and they have not bothered to file briefs supporting the portion of the judgment in their favor.

■ American's policy may well provide no coverage to Ragland and Donnelly; and although Cargo is in a stronger position, it may have waived any argument it had by not pressing the contention in the district court or here. We determined on the first go-'round that if American's policy does not provide coverage, American has no legal interest in obtaining a declaration that Occidental's policy does—and no one with such an interest has appeared in this court, let alone filed a notice of appeal. We therefore decline to disturb the district court's judgment in Occidental's favor. If after remand the district court should reaffirm its holding that American's policy provides coverage, there will be time enough to consider whether Occidental supplies coverage. Whether it does would depend, in part, on any findings of fact the district court may make, and any new theory undergirding American's coverage—and, we suppose, on the arguments Cargo, Ragland, and Donnelly might make in any motion the district court sees fit to entertain under FED.R.CIV.P. 60(b).

The judgment is vacated, and the case is remanded for further proceedings, to the extent it concerns the coverage of American's policy. The appeal is dismissed for want of the real parties in interest to the extent it concerns the coverage of Occidental's policy. See *Fisher v. Tucson School District No. 1*, 625 F.2d 834, 837 (9th Cir. 1980).