[Cite as *Great Am. Assurance Co. v. Acuity*, 2022-Ohio-501.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY

|  |  |  |
|---|---|---|
| GREAT AMERICAN ASSURANCE COMPANY, | : | |
| | : | CASE NO. CA2021-08-097 |
| Appellee, | : | O P I N I O N |
| | | 2/22/2022 |
| - vs - | : | |
| | : | |
| ACUITY, A MUTUAL INSURANCE COMPANY, et al. | : | |
| | : | |
| Appellants. | | |

CIVIL APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
Case No. CV2020-04-0767

Montgomery Johnson, LLP, and George D. Jonson, for appellee.

Lewis, Brisbois, Bisgaard & Smith LLP, and Judd R. Uhl and Katherine L. Kennedy, for appellant, Acuity, A Mutual Insurance Company.

**HENDRICKSON, J.**

{¶1} Appellant, Acuity, A Mutual Insurance Company ("Acuity"), appeals the decision of the Butler County Court of Common Pleas granting summary judgment to appellee, Great American Assurance Company ("GAAC"). For the reasons outlined below, we affirm the trial court's decision.

Background

{¶2}    This case arises from a vehicular accident that occurred on October 4, 2019 between a 2000 Volvo tractor owned by Herb Winsted ("the Truck") and another motor vehicle.  At the time of the accident, Winsted was an independent contractor for Wm. Hafer Drayage Co. ("Hafer"), which is an intermodal trucking company that hauls containers via company drivers and independent contractors.  Pursuant to his independent contractor agreement with Hafer, Winsted provided transportation related services to Hafer and used the Truck to move containers to and from different warehouses.  Winsted began exclusively hauling loads for Hafer in 2019, and at the time of the accident, the Truck displayed Hafer's name and "DOT" number on its door.

Winsted's Insurance Coverage

{¶3}    Pursuant to Winsted's independent contractor agreement with Hafer, the Truck was covered by Hafer's "public liability [and] property damage * * * insurance coverage[.]"  At the time of the accident, Hafer was insured with Acuity via a Commercial Auto and Commercial Excess Liability Policy ("the Acuity Policy").  Pursuant to the Acuity Policy, Acuity agreed to "pay all sums an *insured* legally must pay as damages because of *bodily injury or property damage* to which this insurance applies, caused by an *accident* and resulting from the ownership, maintenance or use of a covered *auto*."  (Emphasis sic.)  The parties do not dispute that the Acuity Policy includes the Truck in its schedule of covered autos.

{¶4}    Winsted also obtained a Non-Trucking Liability and Physical Damage Policy from GAAC for the Truck while it was not being operated on behalf of Hafer ("the GAAC Policy").  Obtaining such a policy was a requirement of Winsted's independent contractor agreement with Hafer.  Pursuant to the GAAC Policy, GAAC agreed to provide liability coverage for the Truck as described by Part (II)(A) of the policy.  Specifically, the policy

states that,

> [GAAC] will pay all sums an **insured** legally must pay as damages because of **bodily injury** or **property damage** to which this insurance applies, caused by an **accident** and resulting from the ownership, maintenance or use of a covered **auto**.

Part (II)(C) of the GAAC Policy provides certain coverage exclusions, and indicates that,

> [t]his insurance does not apply to any of the following:
>
> * * *
>
> 13. TRUCKING OR BUSINESS USE
>
> **Bodily injury** or **property damage** arising out of any **accident** which occurs while the covered **auto** is being used in the business of any lessee or while the covered **auto** is being used to transport cargo of any type.  For purposes of this exclusion, the phrase "in the business of any **lessee**" means any of the following uses of the covered **auto**:
>
> * * *
>
> (f) while traveling from * * * (1) any terminal or facility of any **lessee**; * * * to any location where the covered auto is **regularly garaged**.

{¶5}    The GAAC Policy defines "lessee" as "any person or organization to whom a **covered auto** is leased, rented or loaned."  The phrase "regularly garaged" is defined as "parked or stored on a regular basis, whether indoors or outdoors."

<u>Winsted's Business for Hafer and the Day of the Accident</u>

{¶6}    While working with Hafer, Winsted received his job assignments from Hafer's dispatcher.  On a typical workday, dispatch would direct Winsted to his first pickup assignment, which Winsted would drive to in the Truck directly from his home.  After completing his initial pickup, Winsted would communicate with dispatch to pick up, drop off, and move containers to various locations using the Truck and a Hafer chassis, i.e., trailer.  After completing his final assignment of the day, Winsted would either proceed to the Hafer shipping yard ("the shipping yard"), located at 11320 Mosteller Road, to return the chassis,

or go directly to his home at 5360 Alert New London Road. Regardless of whether Winsted returned to the shipping yard after his final assignment or proceeded directly home, Winsted always garaged the Truck at his home. As a result, Winsted typically began and ended his workday with the Truck at his home.

{¶7} On October 4, 2019, the date of the accident, Winsted alerted dispatch at 7:53 a.m. that he had completed his first assignment of the day and planned to take the Truck to Hafer's shop for transmission fluid. After receiving the transmission fluid, Winsted continued to communicate with dispatch and completed several additional deliveries and pickups in Ohio and Kentucky. At 3:06 p.m., Winsted informed dispatch that he had completed a delivery, but still had a chassis. At that point, dispatch instructed Winsted to return to the shipping yard to return the chassis.

{¶8} The location of Winsted's final delivery was approximately two or three miles from the Hafer shipping yard. Upon arriving at the shipping yard, Winsted returned the chassis and submitted his weekly paperwork to the dispatcher. After conversing with a few workers, Winsted left the shipping yard in the Truck and headed home. Winsted could not recall how long he remained at the shipping yard prior to heading home. On his way home, Winsted stopped at Ollie's Bargain Outlet ("Ollie's"), where his wife was working at the time, and purchased blue jeans. Winsted could not recall how long it took to get to Ollie's or how long he spent inside the store. After leaving Ollie's, Winsted continued his customary route home, stopping for fuel at a Marathon gas station on the way. The accident occurred after Winsted left the Marathon gas station, around 5:00 p.m., and on Winsted's typical route home from the shipping yard.

{¶9} From the time Winsted left the shipping yard until the accident, it is undisputed that Winsted took the same route, aside from a one-half mile deviation, that he would have taken had he traveled directly home without any detours. Typically, Winsted would have

taken Interstate 275 westbound to State Route 126. At that point, Winstead would have turned onto State Route 27, also known as Colerain Avenue. He would have proceeded west onto Hamilton Cleves Road, followed by right turn onto Cincinnati Brookville Road and a left turn onto his street, Alert New London Road.

{¶10} Winsted's stop at Ollie's to purchase blue jeans only took him approximately one-half mile off Interstate 275. After purchasing the jeans, Winsted returned to Interstate 275 at the same place he exited and continued westbound on his normal route home. Winsted then pulled into the Marathon gas station, located on Hamilton Cleves Road, after exiting State Route 27. After purchasing fuel, Winsted continued on Hamilton Cleves Road, as he would have on a typical drive home. Approximately five to seven minutes from Winsted's home, at the intersection of Cincinnati Brookville Road and Brown Farm Drive, Winsted collided with another vehicle, allegedly causing harm to the vehicle's minor passengers. Thus, despite the brief departures and returns to his normal route, Winsted's drive home from the shipping yard was the same route he would have typically taken at the end of a workday.

The Declaratory Action and Summary Judgment Decision

{¶11} After the accident, GAAC filed a complaint for declaratory judgment in the trial court. Relevant here, GAAC requested the trial court to enter a judgment against Acuity declaring that, based on the language in the Trucking or Business Use Exclusion in Part (II)(C)(13)(f)(1), the GAAC Policy did not provide coverage for injury arising out of the October 2019 accident.

{¶12} Acuity denied that the GAAC Policy did not provide coverage for injuries arising from the accident and sought declaratory judgment in a counterclaim. Specifically, Acuity requested the trial court to enter a judgment declaring that Acuity has no coverage obligation under the Acuity Policy for Winsted because he is not an insured under Acuity's

Policy.

{¶13}  On March 26, 2021, both parties moved the trial court for summary judgment. After a hearing, the trial court granted GAAC's motion for summary judgment and denied Acuity's motion.  In so doing, the trial court held that "based upon the undisputed facts, * * * the GAAC Policy does not provide coverage based upon the application of the GAAC Policy's Trucking or Business Use Exclusion."  The trial court entered judgment in favor of GAAC declaring that no insurance coverage was available under the GAAC Policy for any claims that have been made, or may be asserted, as a result of the October 2019 accident.

The Appeal

{¶14}  Acuity now appeals, raising the following assignment of error for our review:

{¶15}  Assignment of Error No. 1:

{¶16}  THE TRIAL COURT ERRED IN DETERMINING THAT GAAC'S NON-TRUCKING POLICY DOES NOT PROVIDE COVERAGE FOR EARL WINSTEAD (sic).

{¶17}  This court reviews a trial court's summary judgment decision under a de novo standard.  *Deutsche Bank Natl. Trust Co. v. Sexton*, 12th Dist. Butler No. CA2009-11-288, 2010-Ohio-4802, ¶ 7.  Summary judgment is appropriate under Civ.R. 56 when (1) there is no genuine issue of material fact remaining to be litigated, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds can come to but one conclusion and that conclusion is adverse to the nonmoving party, who is entitled to have the evidence construed in his favor.  *BAC Home Loans Servicing, L.P. v. Kolenich*, 194 Ohio App.3d 777, 2011-Ohio-3345, ¶ 17 (12th Dist.), citing *Zivich v. Mentor Soccer Club, Inc.*, 82 Ohio St.3d 367, 369-370 (1998).

{¶18}  The party requesting summary judgment bears the initial burden of informing the court of the basis for the motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact.  *Dresher v. Burt*, 75 Ohio St.3d

280, 292 (1996). Once a party moving for summary judgment has satisfied its initial burden, the nonmoving party "must then rebut the moving party's evidence with specific facts showing the existence of a genuine triable issue; it may not rest on the mere allegations or denials in its pleadings." *Sexton* at ¶ 7; Civ.R. 56(E).

{¶19} On appeal, Acuity argues the trial court erred in finding the Trucking or Business Use Exclusion precluded coverage under the GAAC Policy for two reasons. First, Acuity contends the trial court erred in concluding that the language of the Trucking or Business Use Exclusion Part (II)(C)(13)(f) excludes coverage for Winsted. Acuity further claims the remaining exclusions of the GAAC Policy do not apply to Winsted, and do not preclude coverage for the accident.

{¶20} "The words and phrases contained in an insurance policy must be given their plain and ordinary meaning unless there is something in the contract that would indicate a contrary intention." *Hance v. Allstate Ins. Co.*, 12th Dist. Clermont No. CA2008-10-094, 2009-Ohio-2809, ¶ 20. It is well established that contracts of insurance are to be strictly construed against the insurer, especially when an exclusionary clause is at issue. *United Ohio Ins. Co. v. Vanosdol,* 12th Dist. Warren Nos. CA92-09-073 and CA92-08-075, 1993 Ohio App. LEXIS 2756, *4 (June 1, 1993). "An exclusion in an insurance policy will be interpreted as applying only to that which is clearly intended to be excluded." *Hybud Equip. Corp. v. Sphere Drake Ins. Co., Ltd.*, 64 Ohio St.3d 657, 665 (1992). However, while exclusions in insurance contracts are read narrowly in Ohio to apply only to that which is clearly intended to be excluded, that rule of strict construction does not permit a reviewing court to ignore the obvious intent of an exclusionary provision. *AKC, Inc. v. United Specialty Ins. Co.*, Slip Opinion No. 2021-Ohio-3540, ¶ 11, citing *Hybud Equip. Corp.* at 665.

{¶21} As noted above, the trial court granted summary judgment in GAAC's favor

on the basis that Winsted was not covered by the GAAC Policy pursuant to its Trucking or Business Use Exclusion. The parties do not dispute that the Truck is a covered auto as defined by the GAAC Policy, that the Truck was regularly garaged at Winsted's home, or that the shipping yard is a facility of Hafer, a lessee. Rather, the primary issue on appeal is whether Winsted was "in the business of [Hafer]," as that term is defined in the Trucking or Business Use Exclusion, at the time of the accident.

{¶22} In concluding that Winsted remained in the business of Hafer at the time of the accident, the trial court relied upon the Sixth Circuit's decision in *Illinois Natl. Ins. Co. v. Ohio Security Ins. Co.*, 452 Fed. Appx. 651 (6th Cir. 2011). In *Illinois Natl.*, the court considered an appeal related to insurance coverage after a motor vehicle accident. Like Winsted, the driver, Terry Moon, leased his tractor to a motor carrier and was driving the tractor, which displayed the motor carrier's identification placard in its window, at the time of the accident. *Illinois Natl.* at 651- 652.

{¶23} The motor carrier maintained liability insurance with Illinois National, which provided coverage for Moon's tractor. *Id.* at 651. Moon also maintained a separate "non-trucking use" policy with Ohio Security, which provided coverage when Moon's tractor was not being used in the business of any trucking company. *Id.* at 652. Like the GAAC Policy, Moon's policy with Ohio Security provided certain exclusions, and excluded coverage when the tractor was being maintained or used "at the direction of, under the control of, under orders from, after being dispatched by, or in the business of any trucking company or lessee of such auto." *Id.* The Ohio Security policy also excluded coverage when the tractor was "on a return trip to the place it is customarily garaged * * * after having delivered goods or merchandise under direction, control, or dispatch to anyone other than the Named Insured under this policy." *Id.*

{¶24} Like Winsted, Moon  regularly parked his tractor at his home, was paid a flat

rate per assignment, and did not drive for the motor carrier on the weekends. *Id.* On the date of the accident, Moon picked up a load at Dofasco, Inc. ("Dofasco") in Marion, Ohio. *Id.* at 653. Moon planned to take the loaded trailer to his home for the weekend before making the delivery to Florida, however, the motor carrier instructed Moon to leave the loaded trailer at Dofasco for the weekend and to pick it up on Sunday night. *Id.* At that point, Moon detached his loaded trailer and headed toward Upper Sandusky, Ohio to look for a truck wash. *Id.* Unable to locate a truck wash after checking "a couple" places, Moon began to head home. *Id.* From the time Moon left Dofasco until the accident, he took the same route he would have taken had he traveled directly home without detouring to look for the truck wash, which consisted of a one-half mile departure from the highway. *Id.* After returning to the highway, Moon collided with a motorcycle, killing its driver and passenger. *Id.* After the driver and passenger's estate sued Moon and the motor carrier, Ohio Security denied coverage on the basis that the accident occurred while Moon was returning to his home terminal and acting in the business of the motor carrier. *Id.*

{¶25} On appeal, the court considered whether Moon was "in the business" of the motor carrier at the time of the accident, as he was en route to his home, where he typically parked his tractor, but took a detour to locate a truck wash. In answering that proposition in the affirmative, the court noted that, pursuant to Ohio law, "'an owner-driver remains in the business of the carrier-lessee until the owner-driver "returns to the point where the haul originated * * * to the terminal from which the haul was assigned * * *, or to the owner-driver's home terminal from which he customarily obtained his next assignment."'" *Illinois Natl.* at 654, quoting *Marine Ins. Co. Frankart*, 69 Ill.2d 209, 218 (1977); see also *Cincinnati Ins. Co. v. Haack*, 125 Ohio App. 3d 183 (2d Dist.1997). Thus, when considering the totality of the events prior to the accident, the court determined that Moon remained in the business of the motor carrier until he returned home from Dofasco and was excluded from Ohio

Security's coverage. *Id.* at 655.

{¶26} Particularly relevant here, the court further held that Moon's detour to look for a truck wash did not remove him from the motor carrier's business. Rather, the court explained the following:

> * * * Moon's brief detour to look for a truck wash does not affect this analysis; the accident occurred after the detour was complete and Moon had returned to his customary route home. However, even if the detour were a relevant consideration, this Court has previously found that minor personal detours such as the one here do not take a driver out of the carrier's business. *See Auto-Owners Ins.*, 549 F.3d at 1046 (driver remained in carrier's business where he left loaded trailer at delivery site then drove to find a motel); see also *Frankart*, 370 N.E.2d 1062 (driver's detour to buy cheap fuel and find additional work from a different carrier did not take him out of dispatching carrier's business).

*Id.* In light of its analysis above, the court affirmed the trial court's decision granting summary judgment in favor of Ohio Security. *Id.*

{¶27} After our review, we agree with the basic principle set forth in *Illinois Natl.* that when a driver is operating a vehicle in the business of a motor carrier on a customary route, short personal detours do not take the driver out of the business of the motor carrier. Applying this principle to the facts before us, we arrive at the same result, and find that Winsted was operating the Truck "in the business of" Hafer at the time of the accident. This is because Winsted had completed his short personal detours and returned to his customary route home before the accident occurred. Consequently, because Winsted was traveling from a Hafer facility to the place where the Truck was regularly garaged at the time of the accident, the GAAC Policy excludes any coverage for damage or liability.

{¶28} Acuity attempts to distinguish *Illinois Natl.* on various grounds, including that the Trucking or Business Use Exclusion of the GAAC Policy is

fundamentally different than the policy language interpreted by the court in *Illinois Natl.* and that while Moon made a single personal detour, Winsted made two detours, one to Ollie's and one to Marathon. In light of these distinctions, Acuity argues *Illinois Natl.* should not govern the result in this case.

{¶29} After our review of the record and the relevant case law, we find these distinctions to be without a difference. As an initial note, the record reflects Winsted and Moon were in substantially similar circumstances at the time of their accidents. Winsted, like Moon, was en route to his home for the weekend, and did not anticipate receiving or working on another assignment until the weekend concluded. Like Moon, Winsted did not typically work on the weekends and the accident occurred on a Friday after completing his last delivery for the week. While Moon's delivery was not fully completed, he had been authorized to leave the trailer on location for the weekend. Accordingly, at the time of the accident, both Winsted and Moon had completed a delivery at a facility and were on a return trip home, the place where their vehicles were regularly garaged, for the duration of the weekend.

{¶30} Additionally, both made slight personal detours from their customary routes home, approximately one-half mile away from their typical path. While Acuity argues Winsted's detours were more elaborate than Moon's, lasting approximately two hours and consisting of two personal stops as opposed to one, we note that the court's decision in *Illiinois Natl.* does not reference the length of Moon's detour. Regardless, it is evident Moon stopped at more than one place to search for a truck wash. Furthermore, the record in this case indicates approximately two hours elapsed between Winsted completing his final delivery and the accident. During that time, Winsted drove to the shipping yard, removed his chassis, turned in his paperwork, chatted with his fellow coworkers, and then began his drive home.

Winsted could not recall how long he spent at Ollie's or at Marathon gas station, however, given the description of those detours, we find they do not constitute anything greater than minor personal detours that were incidental to his drive home. This is particularly true given the brief nature of the detours and the fact that Winsted had completed the detours and returned to his customary route home before the accident occurred.

{¶31} Lastly, while we agree with Acuity that Winsted did not travel directly from the Hafer facility to his home, we disagree that such a fact precludes application of Part 13(f) of the GAAC Policy's Trucking or Business Use Exclusion. That is, in light of our analysis above, Winsted's brief personal detours did not negate that Winsted was traveling from the facility of the lessee to a location where the Truck was regularly garaged, nor did they alter his status of being in the business of Hafer at the time of the accident. On this basis, reasonable minds could only conclude that the GAAC Policy does not provide coverage in this instance.

{¶32} Thus, in light of the plain and unambiguous language in the policy before us and given the evidence submitted by GAAC in support of its motion for summary judgment, we find that GAAC has demonstrated that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. Based on the evidence submitted, we find that a reasonable trier of fact could only come to one conclusion: the GAAC Policy does not provide coverage based upon the application of the GAAC Policy's Trucking or Business Use Exclusion and as a result, no insurance coverage is available under the GAAC Policy issued to Winsted for any claims that have been made, or may be asserted, arising out of the October 2019 accident.

{¶33} Because the Trucking or Business Use Exclusion conclusively

resolves this dispute, we have no need to consider whether coverage in this case is additionally barred under a different exclusion in the GAAC Policy. Finding no error in the trial court's decision granting summary judgment in favor of GAAC, we overrule Acuity's sole assignment of error and affirm the judgment of the trial court.

{¶34} Judgment affirmed.

M. POWELL, P.J., and S. POWELL, J., concur.