# Illinois Official Reports

## Appellate Court

---

### *Brettman v. M&G Truck Brokerage, Inc.*, 2019 IL App (2d) 180236

---

| | |
|---|---|
| Appellate Court Caption | DEREK BRETTMAN, Individually and as Guardian of GINA BRETTMAN, a Disabled Person, Plaintiff-Appellant, v. M&G TRUCK BROKERAGE, INC., and TEXANA PICKLE PRODUCERS, INC., Defendant-Appellees. |
| | |
| District & No. | Second District<br>Docket No. 2-18-0236 |
| | |
| Rule 23 order filed<br>Motion to<br>publish allowed<br>Opinion filed | December 21, 2018<br><br>January 17, 2019<br>January 17, 2019 |
| | |
| Decision Under Review | Appeal from the Circuit Court of McHenry County, No. 15-LA-76; the Hon. Thomas A. Meyer, Judge, presiding. |
| | |
| Judgment | Affirmed. |
| | |
| Counsel on Appeal | Milo W. Lundblad and Jerome A. Urbik, of Brustin & Lundblad, Ltd., of Chicago, for appellant.<br><br>James P. Crawley and Gerald A. Kennedy, of Kennedy & Associates, PC, of Chicago, for appellee M&G Truck Brokerage, Inc. |

Michael D. Sanders and Kingshuk K. Roy, of Purcell & Wardrope, Chtrd., of Chicago, for other appellee.

Panel          JUSTICE JORGENSEN delivered the judgment of the court, with opinion.
Justices Burke and Hudson concurred in the judgment and opinion.

**OPINION**

¶ 1      Plaintiff, Derek Brettman, individually and as guardian of Gina Brettman, appeals the trial court's grant of summary judgment to defendants, M&G Truck Brokerage, Inc. (M&G), and Texana Pickle Producers, Inc. (Texana), on four counts. Counts I and II were against M&G for negligence (vicarious liability) and negligent hiring. Counts III and IV were against Texana and were also for negligence (vicarious liability) and negligent hiring. For the reasons that follow, we affirm.

¶ 2                            I. BACKGROUND

¶ 3      This matter arises out of a traffic accident between Gina Brettman and a tractor trailer driven by Isreal Vela, an employee of E.G.G. Trucking, which was owned by Efren Garcia (hereinafter collectively referred to as E.G.G., where appropriate). The accident occurred at a Huntley intersection that was under construction. It occurred after Vela had delivered a load of cucumbers from Texana in Progresso, Texas, to a Kraft/Claussen pickling plant in Woodstock. M&G brokered the delivery of the cucumbers. Plaintiff filed a 27-count complaint against E.G.G., Kraft/Claussen, Texana, M&G, and various entities involved in the construction of the intersection, such as Brown Traffic Products and Siemen's Industry, Inc. Plaintiff reached settlements with many of these entities, including Kraft/Claussen and several of the construction entities. Plaintiff's action remains pending as to E.G.G. This appeal concerns M&G and Texana only, and the trial court has entered the requisite finding under Illinois Supreme Court Rule 304(a) (eff. Mar. 8, 2016).

¶ 4      Texana grows cucumbers in Texas and Mexico. It sells the cucumbers to processing facilities across the United States, such as the Kraft/Claussen plant in Woodstock. It is not a trucking company, does not own any commercial or semitrucks, and does not have a department of transportation number or motor carrier authority. It does not contract with trucking companies. Rather, it works with shipping brokers to arrange the shipments. (In 2010, four years before the accident, a part owner of Texana, Frank Gonzalez, left Texana and became a part owner at M&G. Members of the same, extended Gonzalez family work at both companies.)

¶ 5      M&G is a Texas business entity that brokers freight delivery of products. M&G maintains a roster of 3000 carrier companies across the country, upon which it draws to arrange for the shipment of goods for its clients. To be on the roster, a carrier is required to submit a carrier information form, an insurance certificate, a W-9 form, and its motor carrier and department of transportation numbers. M&G does not have an exclusive contract with any of its carriers. It

works with a number of carriers, just as each carrier works with a number of brokers. As such, M&G does not have a long-term contract with any of its carriers. Instead, each shipment load requires its own contract.

¶ 6    E.G.G. is a licensed motor carrier. It owned the refrigerated trailer involved in the instant case. It also owned the tractor that pulled the trailer, and it paid for all of the maintenance and insurance for the equipment. E.G.G. hired Vela, who had been working for E.G.G. for 10 years.

¶ 7    In August 2013, Texana entered into a contract with Kraft/Claussen to supply cucumbers for the 2013-14 season. Throughout that season, Texana worked with 10 different brokerage companies to arrange for the shipment of its cucumbers. In turn, those 10 brokerage companies secured 100 different motor carriers to haul the cucumbers.

¶ 8    On March 9, 2014, Texana contacted M&G, asking M&G to arrange the shipment at issue. M&G, in turn, chose E.G.G. to haul the load. M&G had been working with E.G.G. since 2007. In those seven years, M&G had selected E.G.G. to haul as many as 10 loads per month without incident.

¶ 9    M&G took the following actions in brokering the load. It negotiated the freight and shipping charges. And it negotiated its own commission on the shipping charges. After the delivery was completed, Texana would pay M&G the shipping charge. Then, M&G would pay E.G.G., after deducting its own commission. M&G advanced $1500 to E.G.G. to cover expenses in hauling the load, like gas.

¶ 10   The contract between M&G and E.G.G. set forth certain instructions for the trip, such as the required temperature to keep the trailer. Kraft/Claussen chose the temperature and the deadline for delivery. Vela was to call M&G daily, before 10 a.m., or be subject to a $150 fine. He was also to call M&G if there was any delay that would prevent him from delivering the load on time.

¶ 11   Instructions aside, Vela testified in deposition that he conducted his own pre-trip inspection of the truck. He would address any problems with equipment without asking M&G for help. He chose what route to take, what speed to travel, and when to fuel up. He did not feel rushed over the course of the trip.

¶ 12   E.G.G. paid Vela for executing the trip. It administered Vela's drug testing and provided his safety training. E.G.G. instructed Vela to pick up the load from Texana at approximately 11 a.m. on March 9, 2014. Vela was to deliver the load to Kraft/Claussen by 5 a.m. on March 14, 2014.

¶ 13   After unloading the cucumbers at the Kraft/Claussen plant, Vela was no longer required to check in with M&G. E.G.G. instructed Vela to take Interstate 90 to the nearest truck stop to wait for a new load assignment, which could originate from M&G or a new broker. After delivering the load, about 25 miles from the Kraft/Claussen plant but before reaching Interstate 90, Vela collided with Brettman at an intersection. Vela was going straight, driving at the posted speed limit of 45 miles per hour, and Brettman was turning left with a green arrow. The intersection was under construction, and Vela later stated that he was confused by the traffic control signals. Vela saw that the permanent traffic signals were covered, so he assumed there were no traffic controls for drivers traveling in his direction. At the last second, he saw a temporary traffic signal hung with wire over the intersection. The temporary signal was red.

He could not stop in time, and he collided with Brettman. Brettman suffered severe injuries as a result of the collision and filed the instant lawsuit.

¶ 14    In the seventh amended complaint at issue here, the first four counts are relevant. In count I, plaintiff alleged negligence (vicarious liability) against M&G. Plaintiff theorized that E.G.G., with Vela as its driver and Garcia as its owner, were agents of M&G because M&G imposed rules on driver conduct, thereby exercising a requisite degree of control to establish a principal-agent relationship. The agents were guilty of one of the following wrongful acts or omissions: failure to stop at a red light, failure to keep a reasonably careful lookout for other vehicles, failure to decrease speed, and driving too fast for conditions. As a result of these wrongful acts or omissions, Vela's truck collided with Brettman's automobile, causing injury.

¶ 15    In count III, plaintiff alleged the same, but against Texana.

¶ 16    In count II, plaintiff alleged negligent hiring against M&G. He alleged that M&G had a duty to exercise reasonable care when it selected a carrier to haul the load at issue. In his view, the exercise of reasonable care included performing an independent investigation and background check on E.G.G. and Vela. Had M&G performed an adequate investigation, it would have discovered, *inter alia*, that E.G.G. was an unrated motor carrier and that Vela had a history of forging time sheets. M&G negligently hired a company it should have known to be unfit. The exercise of reasonable care in hiring also included supervising E.G.G. in the transportation and delivery of commercial product to Kraft/Claussen. M&G failed in this as well. As a result of these wrongful acts or omissions, Vela's truck collided with Brettman's automobile, causing injury.

¶ 17    In count IV, plaintiff alleged the same, but against Texana.

¶ 18    The parties proceeded to discovery, where the evidence established the facts discussed above. In addition, plaintiff retained Whitney Morgan to testify to a broker's duty of care in selecting a trucking company. Morgan had worked for the United States Department of Transportation, enforcing regulations. Morgan reviewed the evidence in the case, including the deposition testimony of Vela and Garcia. In Morgan's view, brokers should contract only with carriers that have satisfactory ratings from the Federal Motor Carrier Safety Administration (FMCSA). The FMCSA conducts compliance reviews to determine whether a carrier meets minimum safety standards. The FMCSA never conducted a compliance review on E.G.G., so E.G.G. was an "unrated" carrier. In Morgan's opinion, a broker should not contract with an unrated carrier.

¶ 19    Morgan posited that, if a broker *were* going to contract with an unrated motor carrier, it should conduct its own safety review. To do this, a broker should go to the FMCSA website to see if a given carrier has a record of accidents or safety violations. The FMCSA website showed that, while unrated overall, E.G.G. was rated at 75% on one metric measuring management controls. This was above FMCSA's "intervention threshold" of 65%. E.G.G.'s two drivers had four citations between them in the 14 months preceding the accident for falsifying time sheets and driving without enough rest. In fact, Garcia admitted in deposition that he was aware that Vela had previously falsified a time sheet. Garcia informed Vela that he would be fired if he did it again. Also, Vela previously documented average speeds of 70 miles per hour. This speed is unrealistic, given that a trip is not entirely highway driving. Either Vela was speeding, or he drove more hours than allowed by federal regulations.

¶ 20    According to Morgan, it is clear that Vela once again falsified his time sheets while performing on the contract with M&G. Under certain conditions applicable here, federal

regulations require a driver to rest a minimum of 10 hours before going back on the road each day. Morgan hypothesized that, from the times and locations recorded on Vela's cell phone, it is clear he did not do this. Morgan believed that Vela drove 18 hours without proper rest before arriving at the Kraft/Claussen docking station and that he got less than 6.5 hours of sleep on the night preceding the accident.

¶ 21 Maria Vergara, a general manager for M&G, testified in a deposition that she has used the FMCSA website to search for driver safety violations. In the past, she has disqualified certain carriers based on the FMCSA information concerning prior violations. However, she did not perform a review of E.G.G. prior to this trip. She was aware, prior to contracting with E.G.G. for this trip, that an E.G.G. driver had been in a weather-related accident within the past year. No one was hurt in that accident.

¶ 22 Both M&G and Texana moved for summary judgment. In his response, plaintiff affirmatively abandoned count III, negligence (vicarious liability) against Texana. The trial court granted summary judgment to M&G and Texana on the remaining counts.

¶ 23 As to count I, vicarious liability as to M&G, the court agreed with M&G that any agency relationship shared by M&G and E.G.G., if it ever existed, terminated after Vela completed the delivery. The court stressed that M&G had no control over Vela after the delivery:

> "[P]laintiff put forth the argument that[,] *if* the fatigue *** occurred as a result of his driving while in the employ or acting as an agent of *** M&G, *** M&G should *** *then* continue to be responsible after *** the delivery of the product, and I would disagree with that because after the delivery *** their authority to control his actions terminated as well.
>
> And they couldn't tell him don't drive. They couldn't tell him sleep." (Emphases added.)

Further, Vela no longer had an obligation to check in with M&G. The court stated:

> "[T]here was no obligation that he make phone calls, there was no obligation that he refrigerate anything. There was no obligation to *** M&G that he do anything. He was dead to them at that stage."

¶ 24 The court rejected plaintiff's argument that the agency relationship continued after the delivery because, according to plaintiff, "if you have a trip assignment, a trip contract, that trip does not end until the driver reaches his home base." See *St. Paul Fire & Marine Insurance Co. v. Frankart*, 69 Ill. 2d 209 (1977). M&G responded that *St. Paul* was inapposite. It concerned the interpretation of an insurance contract, not the scope of an agency relationship. The court agreed with M&G: "I don't think the *St. Paul* case is applicable to this situation. I think factually it is distinguishable, and the fact that it addresses insurance coverage rather than the scope of an agency relationship for people who hired a carrier tells me not to rely on it."

¶ 25 As to counts II and IV, negligent hiring, the court granted summary judgment to M&G and Texana, respectively. It determined that, regardless of which company had selected E.G.G., the accident occurred after the completion of the work E.G.G. was hired to perform. The court appeared to classify the issue of liability beyond the limits of the contracted-for work as determinative of the *duty* element rather than the *proximate-cause* element. It stated: "I'm less comfortable getting into a question of proximate cause, because that's a tougher standard for summary judgment." This appeal followed.

II. ANALYSIS

¶ 27     Plaintiff appeals the trial court's grant of summary judgment to M&G and Texana on all four counts. We will not address count III, negligence (vicarious liability) as to Texana, because plaintiff unequivocally conceded below and at oral argument that no evidence supported that claim. Therefore, the argument is waived.

¶ 28     As to the remaining counts, "[s]ummary judgment is proper where, when viewed in the light most favorable to the nonmoving party, the pleadings, depositions, admissions, and affidavits on file reveal that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Northern Illinois Emergency Physicians v. Landau, Omahana & Kopka, Ltd.*, 216 Ill. 2d 294, 305 (2005).

> "[W]hile a plaintiff need not prove [his] entire cause during summary judgment, [he] must present some evidentiary facts to support the elements of [his] cause of action. [Citation.] If the plaintiff fails to establish even one element of the cause of action, summary judgment in favor of the defendant is wholly proper." *Wallace v. Alexian Brothers Medical Center*, 389 Ill. App. 3d 1081, 1085 (2009).

We review a grant of summary judgment *de novo*. *Sollami v. Eaton*, 201 Ill. 2d 1, 7 (2002). And, we may affirm a grant of summary judgment for any reason that finds its basis in the record, regardless of whether the trial court exercised similar reasoning. *Northern Illinois*, 216 Ill. 2d at 305.

¶ 29           A. Count I: Negligence (Vicarious Liability) as to M&G

¶ 30     The parties agree that count I turns on the existence of a principal-agent relationship between M&G and E.G.G. when the alleged negligence occurred. Plaintiff's argument is twofold. He contends that (1) an agency relationship was formed when M&G exercised control over E.G.G.'s delivery of the load and (2) the agency relationship continued after the delivery and through the time that the accident occurred. We reject plaintiff's argument. We agree with the trial court that, even if an agency relationship was formed during the delivery of the load, it terminated when E.G.G. completed its contractual obligation to deliver the load and M&G ceased to exercise any control over it or its driver. Because there was no agency relationship at the time the alleged negligence occurred, the trial court correctly granted summary judgment to M&G.

¶ 31     The principal-agent relationship is an exception to the general rule that a plaintiff in a negligence action must seek a remedy from the person who caused the injury. *Sperl v. C.H. Robinson Worldwide, Inc.*, 408 Ill. App. 3d 1051, 1056-57 (2011). Under the theory of *respondeat superior*, a principal is vicariously liable for the conduct of its agent, but not for the conduct of an independent contractor. *Id.* at 1057. In distinguishing between an agent and an independent contractor, the court must consider the level of control under which the agent or independent contractor operates. *Id.* An agent voluntarily enters into a relationship whereby the principal has a right to control his conduct. *Id.* An independent contractor undertakes to produce a certain result, but he is not under the control of the person for whom he does the work. *Id.* The court is to consider whether there is a right to control the manner of work performance, regardless of whether that right is exercised. *Id.* The court may consider the nature of the work performed in relation to the general business of the employer, the right to discharge, the method of payment, the provision of necessary tools, whether taxes are deducted

from payment, and the level of skill required. *Id.* at 1057-58. No single factor is determinative. *Id.* at 1058.

¶ 32    Both parties agree that *Sperl* controls the issue of whether M&G and E.G.G. *ever* shared an agency relationship. The facts of *Sperl* are as follows. C.H. Robinson Worldwide, Inc., a/k/a C.H. Robinson Company (CHR), was a federally licensed freight broker. It sold its services to customers needing to transport goods, and then it contracted with carriers to provide transportation to its customers. *Id.* at 1052. One of the carriers with whom CHR contracted was Dragonfly. *Id.* at 1052-53. Dragonfly agreed that all transportation would be performed under the contract, which required it to use competent drivers and be responsible for the drivers' salaries, charges, and workers' compensation expenses. The contract specified that Dragonfly was an independent contractor. The contract allowed Dragonfly to haul loads for CHR. As to the specific trip at issue, however, Dragonfly's driver hauled a load of potatoes *owned by CHR*. *Id.* at 1053. CHR issued a load confirmation sheet with special instructions. The special instructions required that Dragonfly's driver " 'stay in constant communication with [CHR]' " and make " 'check calls' " daily no later than 10 a.m. *Id.* at 1054. Further, the driver was to keep the truck at a certain temperature and was given a strict deadline. All of these requirements were enforceable by fine. *Id.* The driver collided with the plaintiff during the haul of CHR's potatoes. She later testified that CHR's tight deadlines and system of fines put pressure on her and made it impossible for her to also comply with federal regulations limiting driving time. *Id.* at 1055. A jury determined that the driver had been an agent of CHR, making CHR liable for damages from the crash. *Id.* at 1056.

¶ 33    On appeal, CHR argued that the trial court should have granted its motion for a judgment notwithstanding the verdict or a new trial, because the evidence did not support the jury's determination of an agency relationship. *Id.* The appellate court disagreed, holding that the evidence was sufficient to uphold the jury's special finding. *Id.* at 1060. Despite contractual evidence that the parties intended an independent-contractor relationship, specific conduct indicated an agency relationship. See *id.* at 1057-58. The court explained that the driver's services were closely aligned with CHR's business of hauling freight for its customers. *Id.* at 1058-59. CHR owned the product at issue as well as the warehouse to which it was being delivered. *Id.* at 1059. CHR was, therefore, motivated to see that the driver delivered the product with care. And, CHR enforced an extensive system of fines, influencing the driver's compensation. *Id.* at 1059-60. It was while trying to adhere to CHR's strict operation requirements that the driver collided with the plaintiff. The court concluded: "Th[e] extensive requirements, coupled with [the driver's] fine-based compliance, directed [her] conduct during the entire transportation process and support the finding that CHR had the right to control the manner in which [the driver] performed her job." *Id.* at 1058. As the evidence supported CHR's right to control the manner in which the driver performed her job, it also supported the existence of an agency relationship. *Id.* at 1059.

¶ 34    Some of the indicia of control set forth in *Sperl* are, arguably, present here. M&G was engaged exclusively in the trucking business. M&G instructed E.G.G. to maintain the truck at a certain temperature and check in once per day. E.G.G. was to notify M&G if the shipment was going to be late. M&G imposed a system of fines to enforce its requirements. Unlike in *Sperl*, however, M&G did not own the product at issue or the warehouse to which it was being delivered. M&G was not acting in furtherance of its own business when it instructed E.G.G. to maintain the truck at a certain temperature. Rather, acting as a broker, it passed on

requirements from Kraft/Claussen. There was no indication that M&G required E.G.G. to remain in "constant contact" or that its operation requirements and system of fines were so onerous that E.G.G. felt pressure to violate federal regulations in order to avoid incurring fines. To the contrary, Vela testified that he did not feel pressure.

¶ 35    The key difference, however, is that, in *Sperl*, the accident occurred when the driver was acting at the broker's direction. Here, in contrast, the accident occurred after E.G.G. had completed its contract for delivery and after M&G ceased to exercise any control over it. For that reason, we, like the trial court, do not find it necessary to determine whether sufficient evidence supports that M&G *ever* had a right to control E.G.G. so as to establish an agency relationship. To us, it is dispositive that, at the time of the accident, M&G did not exercise any control over E.G.G. so as to *continue* in an agency relationship.

¶ 36    We look to the Restatement (Third) of Agency for further support that the agency relationship terminated upon the completion of the contracted-for delivery:

> "[A]n agent's actual authority may terminate upon the occurrence of circumstances under which the agent should reasonably conclude the principal would no longer assent to the agent's taking action on the principal's behalf. If the principal has engaged the agent for a particular task, its completion is such a circumstance." Restatement (Third) of Agency § 3.09 cmt. b, at 229 (2005) (not yet adopted by the supreme court, cited for guidance only).

Here, if it ever existed, the agency relationship terminated upon the completion of the task of delivering the cucumbers to the Kraft/Claussen plant. E.G.G. had already completed the assigned task before the time of the alleged negligence—failure to stop at a red light, failure to keep a reasonably careful lookout for other vehicles, failure to decrease speed, and driving too fast for conditions. No indicia of control were present at that time. M&G could no longer direct E.G.G. in any manner. M&G could no longer inform E.G.G. what to deliver, where to deliver it, what temperature to keep it at, or to stay in contact. It could not tell Vela to rest. E.G.G. alone instructed and controlled Vela after the delivery.

¶ 37    Plaintiff argues that there is "some indication" that E.G.G. was still acting within the scope of its agency relationship with M&G following the delivery because it expected M&G to look for loads it could haul on its return trip to Texas. We reject this argument. That E.G.G. remained open to working with M&G in the future does not create a "genuine issue" that it was operating at its direction at the time of the accident. E.G.G.'s hope or expectation of future business with M&G cannot show M&G's current control over E.G.G.

¶ 38    Plaintiff also argues, as he did below, that the agency relationship between M&G and E.G.G. did "not terminate at the point of delivery [but] continue[d] at least until the owner-driver return[ed] to the point where the haul originated, to the terminal from which the haul was assigned, or the owner-driver's home terminal from which he customarily obtain[ed] his next assignment." *St. Paul*, 69 Ill. 2d at 218; see also *Occidental Fire & Casualty Co. of North Carolina*, 113 Ill. App. 3d 215, 220 (1983); *Hodges v. Johnson*, 52 F. Supp. 488, 492 (W.D. Va. 1943).

¶ 39    Plaintiff takes this quote out of context. *St. Paul* discussed not the termination of an agency relationship, but the definition of a term in an insurance policy, "being used in the business." *St. Paul*, 69 Ill. 2d at 213. To interpret that term, the court looked to define a trip or an assignment. *Id.* at 218-19. The court determined that, in the context of the insurance-coverage

issue before it, a trip did not necessarily end at the point of delivery but could include the return leg. *Id.* at 219.

¶ 40      Our ruling does not conflict with the definition of a trip set forth in *St. Paul* and the other cases cited by plaintiff. This case is not about the definition of a term in an insurance contract. It is about the right to control the work. M&G's right to exercise any control over Vela ended upon the completion of delivery. It was E.G.G., not M&G, who instructed Vela after the completion of delivery and on the return leg. Upon the completion of delivery, E.G.G. was free to accept a new assignment from M&G or any other broker. Unless the parties entered into a new contract, M&G had no control over E.G.G. after its delivery of the cucumbers and satisfaction of the instant contract. Thus, there was no evidence of an agency relationship at the time of the alleged negligence, so M&G cannot be vicariously liable for the alleged negligence. Summary judgment was properly granted on count I.

¶ 41                              B. Counts II and IV: Negligent Hiring

¶ 42      Plaintiff next argues that the trial court erred in granting summary judgment to M&G and Texana on counts II and IV, respectively, for negligent hiring. Under this theory, M&G and Texana would be liable not for E.G.G.'s actions, but for their own actions in hiring E.G.G. to transport the goods. In a negligence action, the plaintiff must plead and prove (1) the existence of a duty of care owed to the plaintiff by the defendant, (2) a breach of that duty, (3) an injury proximately caused by that breach, and (4) damages. *Calles v. Scripto-Tokai Corp.*, 224 Ill. 2d 247, 270 (2007). Proximate cause has two components: cause in fact and legal cause. *Turcios v. The DeBruler Co.*, 2015 IL 117962, ¶ 23. As to cause in fact, courts typically consider the but-for test or the substantial-factor test. *Id.* The but-for test states that conduct cannot be a cause of an event if the event would have occurred without it. *Id.* The substantial-factor test states that conduct is a cause of an event if it was a material element and a substantial factor in bringing about the event. *Id.* As to legal cause, courts typically assess foreseeability. *Id.* ¶ 24. A court must consider whether the injury is one that a reasonable person would see as a likely result of his conduct, or whether the injury is so highly extraordinary that imposing liability is not justified. *Id.* "The question is one of policy—how far should a defendant's legal responsibility extend for conduct that did, in fact, cause the harm?" (Internal quotation marks omitted.) *Id.*

¶ 43      In an action for negligent hiring or retention of an employee, specifically, the plaintiff must plead and prove (1) that the employer knew or should have known that the employee had a particular unfitness for the position so as to create a danger of harm to third persons, (2) that such particular unfitness was known or should have been known at the time of the employee's hiring or retention, (3) that this particular unfitness proximately caused the plaintiff's injury, and (4) damages. *Doe v. Catholic Bishop of Chicago*, 2017 IL App (1st) 162388, ¶ 11. Further, the duty of care in selecting an independent contractor is that which a reasonable person would exercise under the circumstances. *Carney v. Union Pacific R.R. Co.*, 2016 IL 118984, ¶ 66. The common law tort of negligent hiring or retention finds its basis in the Restatement (Second) of Torts § 411 (1965):

> "An employer is subject to liability for physical harm to third persons caused by his failure to exercise reasonable care to employ a competent contractor (a) to do work which will involve a risk of physical harm unless it is skillfully and carefully done, or (b) to perform any duty which the employer owes to third persons."

A "competent and careful contractor" is a contractor who

> "possesses the knowledge, skill, experience, and available equipment which a reasonable man would realize that a contractor must have in order to do the work which he is employed to do without creating unreasonable risk of injury to others, and who also possesses the personal characteristics which are equally necessary." Restatement (Second) of Torts § 411 cmt. a, at 376-77 (1965).

The Illinois Supreme Court has adopted section 411 of the Restatement. See *Carney*, 2016 IL 118984, ¶ 88; *Gomien v. Wear-Ever Aluminum, Inc.*, 50 Ill. 2d 19, 21 (1971) (*Gomien II*).

¶ 44 We begin with count II, negligent hiring against M&G. The parties spend much of their briefs citing Morgan's and Vergara's deposition testimony and debating whether there is a genuine issue that M&G failed in its duty to exercise reasonable care in hiring E.G.G. Even if we assume that there was sufficient evidence to raise a material factual issue as to whether M&G breached its duty of care in hiring E.G.G., plaintiff's argument ultimately fails. The remaining question is whether the failure to exercise reasonable care in hiring E.G.G. to perform the contracted-for work proximately caused the injuries. Although the trial court properly recognized E.G.G.'s completion of the contracted-for work as an enormous hurdle for plaintiff, it did not seem to recognize that the completion of the contracted-for work implicated the *proximate-cause* element: "I'm less comfortable getting into a question of proximate cause, because that's a tougher standard for summary judgment." Instead, the trial court incorrectly assumed that the termination of the hiring relationship implicated the *duty* element. (Perhaps the court meant that there can be no duty to exercise reasonable care in *retaining* an independent contractor where that contractor is no longer retained.) In any case, M&G does not seriously debate that it had a duty to exercise reasonable care in *hiring* a carrier. Regardless of the court's misstatement, we may affirm a grant of summary judgment for any reason that finds its basis in the record. *Northern Illinois*, 216 Ill. 2d at 305. This claim turns on proximate cause.

¶ 45 We recognize that proximate cause is typically a matter for the jury. *Platson v. NSM, America, Inc.*, 322 Ill. App. 3d 138, 144 (2001). However, if the facts alleged do not sufficiently demonstrate both cause in fact and legal cause, which involves policy considerations, the lack of proximate cause may be determined by a court as a matter of law. *City of Chicago v. Beretta U.S.A. Corp.*, 213 Ill. 2d 351, 395-96 (2004). Proximate cause is not a matter for the jury in this case because the cause of action at issue sets forth a rigorous proximate-cause standard that simply cannot be met under the existing record. As we explain, the definition of the cause of action of negligent hiring or retention centers on *the work* to be performed and whether the incompetent execution *of that work* caused harm to a third party. Again, in an action for negligent hiring or retention, the injury must have occurred by virtue of the servant's employment. *Bates v. Doria*, 150 Ill. App. 3d 1025, 1031-32 (1986). The employer's liability attaches "only where there was demonstrated some connection between the plaintiff's injuries and the fact of employment." *Id.* at 1032. As stated in *Carney*, 2016 IL 118984, ¶ 65, an employer is subject to liability for harm to third persons caused by its failure to exercise reasonable care to employ a competent and careful contractor *to do work* that will involve a risk of harm unless *that work* is carefully done.

¶ 46 As a matter of public policy, the courts have set a rigorous proximate-cause standard for the cause of action. *Doe v. Boy Scouts of America*, 2014 IL App (2d) 130121, ¶ 43. In *Gomien II*, the supreme court strongly implied that, to support a claim for negligent hiring or retention,

the injury must have occurred *while* the independent contractor was directly involved in the performance of the contracted-for work, as opposed to an act collateral to the work for which the contractor was engaged. *Gomien II*, 50 Ill. 2d at 24.

¶ 47 In *Gomien v. Wear-Ever Aluminum, Inc.*, 131 Ill. App. 2d 760 (1970) (*Gomien I*), the defendant manufacturer selected an independent contractor to solicit sales. The defendant knew that the contractor must operate a motor vehicle to perform his obligations under the agreement, and the defendant had a duty to persons using highways to exercise reasonable care in selecting the contractor. While operating his vehicle for the solicitation of sales for the defendant, the contractor struck and injured the plaintiff. The plaintiff pleaded that, had the defendant investigated, it would have learned that the contractor was a habitually negligent driver with a history of traffic violations and accidents. *Id.* at 761-62. The trial court dismissed the complaint, and the appellate court affirmed. *Id.* at 765. The appellate court reasoned that there could be no liability, because the accident occurred not when the contractor was directly involved in the work of soliciting customers or selling products, for which he was retained, but when he was engaged in the collateral act of operating his motor vehicle on the highway. *Id.* The supreme court reversed: "Under this state of the pleadings, the operation of the automobile by [the contractor] was not an act collateral to the performance of the work for which he was engaged. It was part of the conduct directly involved in the performance of the work contracted for." *Gomien II*, 50 Ill. 2d at 24.

¶ 48 Applying the law set forth in *Gomien II* leads to a different result in this case. In *Gomien II*, the injury occurred while the contractor was directly involved in completing the contracted-for task. If, as in *Gomien II*, the injury here had occurred while Vela was operating his motor vehicle to deliver produce, M&G might have been subject to liability under a theory of negligent hiring or retention. The difference is that, here, Vela was not operating his vehicle to perform the contracted-for work when the injury occurred. The work for which he had been engaged was completed. He was no longer hired or retained by M&G. He was 25 miles away from the pickle plant.

¶ 49 As in *Gomien II*, in every Illinois negligent hiring or retention case cited by plaintiff, the accident occurred while the selected contractor performed the contracted-for work. See, *e.g.*, *Carney*, 2016 IL 118984, ¶ 88 (no liability, although the construction accident occurred on the job, because the victim subcontractor was not a third party entitled to protection under the cause of action); *Hayward v. C.H. Robinson Co.*, 2014 IL App (3d) 130530, ¶ 43 (no liability, although the traffic accident occurred while the contractor delivered the broker's freight, because the broker did not have reason to know of the particular unfitness); see also *Platson*, 322 Ill. App. 3d at 140 (a negligent supervision claim; assault occurred at work). Similarly, in every non-Illinois negligent hiring or retention case cited by plaintiff, the accident occurred while the selected contractor performed the contracted-for work. See *L.B. Foster Co. v. Hurnblad*, 418 F.2d 727, 728 (9th Cir. 1969) (the accident occurred during the contracted-for haul of steel); *McComb v. Bugarin*, 20 F. Supp. 3d 676, 678 (N.D. Ill. 2014) (same); *Schramm v. Foster*, 341 F. Supp. 2d 536, 540 (D. Md. 2004) (the accident occurred during the contracted-for shipment of soymilk); *Puckrein v. ATI Transport, Inc.*, 897 A.2d 1034, 1037 (N.J. 2006) (the accident occurred during the contracted-for removal of waste); *Hudgens v. Cook Industries, Inc.*, 1973 OK 145, ¶ 1, 521 P.2d 813 (the accident occurred during the contracted-for shipment of wheat).

¶ 50    Our research has not revealed an Illinois negligent hiring or retention case finding proximate cause when the injury occurred after the completion of the contracted-for work, during a period this court has referred to as posttermination. We find *Boy Scouts* instructive on the limitations of posttermination liability. In *Boy Scouts*, a retired scout executive sexually assaulted a teenage boy. *Boy Scouts*, 2014 IL App (2d) 130121, ¶¶ 4-5. The mother sued the local Boy Scouts organization, the Blackhawk Area Council (BAC), alleging, *inter alia*, negligent hiring and retention. *Id.* ¶ 1. Her theory of the case was as follows. The executive was a pedophile who posed a constant threat to boys. BAC knew that, in the past, pedophiles had infiltrated its leadership. *Id.* ¶ 5. BAC did not appropriately screen the executive before awarding him the position, negligently hiring him. *Id.* ¶ 7. If it had screened the executive, it would have known that, in the 1970s, he had been discharged from the military for suspected homosexual activity[1] and that, in the late 1980s or early 1990s, he had been apprehended in Germany for driving under the influence while an 18-year-old man was in the car with him. *Id.* ¶¶ 10-14. Also, BAC did not heed warning signs that occurred during the executive's tenure, negligently retaining him. It had been told that the executive positioned himself in the boys' locker room of a swimming pool complex so as to see the boys changing. *Id.* ¶ 20. The executive interacted with the victim between 2001 and 2006, beginning when the victim was 10 years old. During that time, the executive exploited his leadership role to gain the victim's trust, admiration, and obedience. The two saw each other at all major scouting events. The executive spoke with the victim and his mother at these events. The executive took a special interest in the victim, encouraging him to apply for a foreign exchange program. The executive visited the victim's home to speak with his mother about it. He also agreed to pay for the victim to attend modeling school, though the victim's mother ultimately decided against it. *Id.* ¶¶ 23-24. In March 2006, the executive retired. He no longer held a position with BAC. *Id.* ¶ 27. Three months later, in June or July 2006, the executive invited the victim to go to an event in Michigan with him. The two would share a hotel room, with no one else. The mother agreed to the trip, because she had known the executive for several years, she knew him to be a scout leader, and she trusted him. While on the trip, the executive sexually assaulted the victim. *Id.* ¶¶ 25-26.

¶ 51    The trial court granted summary judgment to BAC. It explained that, as a matter of law, BAC could not have committed the tort of negligent hiring and retention because BAC no longer employed the executive when the executive inflicted the injuries for which the plaintiff sought relief. *Id.* ¶ 29.

¶ 52    This court affirmed. We noted that there was no authority in Illinois for holding an employer liable for posttermination acts. *Id.* ¶ 41. We acknowledged that other jurisdictions were split on the question of liability for posttermination acts, but we declined to make a definitive statement absent a full briefing. *Id.* ¶¶ 41-42. Nevertheless, we appreciated the logic and practicality of deeming an employee's termination a cutoff for employer liability. *Id.* ¶ 41. And, we observed:

> "[T]he law of negligent hiring and retention in this state appears to afford little scope for liability for posttermination acts of employees. We consider first the following representative statement of the tort: 'Liability for negligent hiring arises only when a

---

[1]The court, of course, rejected the mother's insinuation that homosexual individuals were more likely to commit acts of child abuse. *Id.* ¶ 44.

particular unfitness of an applicant creates a danger of harm to a third person which the employer knew, or should have known, when he hired and placed this applicant in employment where he could injure others.' [Citation.] This language suggests that the purpose of the tort is to prevent injuries that occur during the term of employment and, consequently, suggests that the employer's duty of care does not extend beyond the cessation of employment." (Emphasis omitted.) *Id.* ¶ 42.

¶ 53    We distinguished acts occurring posttermination from acts occurring outside the scope of employment. An employer *may* be liable for out-of-the-scope acts, but *only* where the employee is on the employer's premises or using the chattel of the employer and the employer has reason to know of the need and opportunity for exercising control over the employee. *Id.* ¶ 43. As no authority exists for posttermination liability, and as out-of-scope liability is extremely limited, Illinois law and policy have demonstrated a rigorous standard of proximate causation in the context of negligent hiring or retention cases. *Id.* "Under this strict concept of causation, if the injury occurs—as here—after the actor's employment has ended, then *a fortiori* the injury cannot be connected to that employment." *Id.* We summarized that "what plaintiff seeks is a broadening of liability as currently recognized by Illinois law." *Id.* ¶ 51.

¶ 54    As in *Boy Scouts*, plaintiff here is asking this court to expand Illinois law on negligent hiring or retention. We decline to do so. Plaintiff has not cited one case where the accident, wrongful act, or injury occurred posttermination. This case is different from a scenario where a contractor's incompetent workmanship resulted in a construction failure postjob, such as a cornice falling off of a building and onto a pedestrian. See, *e.g.*, *Carney*, 2016 IL 118984, ¶ 79 (discussing the Restatement (Second) of Torts § 411 (1965)). In that example, the *work itself* was not performed in a manner so as to reasonably protect third parties from harm. Here, the work itself, delivering the cucumbers, was performed without incident. Rather, it was the *worker*, not the *work*, who went on, posttermination, to injure a third party. Illinois does not have a policy of making those who select independent contractors become insurers for the independent, posttermination actions of those contractors.

¶ 55    We reject plaintiff's theory that, because E.G.G. continued to perform on its contract with M&G on the return leg of the trip, the accident did not occur posttermination. Plaintiff again cites *St. Paul* for the proposition that, in the trucking industry, an assignment to haul a load does not end until the driver reaches his home base or is assigned a new job. Again, *St. Paul* is not applicable. *St. Paul* sought to define terms set forth in an insurance contract. That issue is inapposite to the instant case. More to the point, here, the contract terminated upon completion of the contracted-for task, the delivery of the cucumbers. After the delivery, E.G.G. had no remaining obligations to M&G. Postdelivery meant posttermination.

¶ 56    We also reject plaintiff's alternate theory that, even if the accident occurred posttermination, the negligent act—driving too many hours so as to become fatigued—occurred predelivery while E.G.G. performed on its contract with M&G. Still, we find this case analogous to *Boy Scouts*. In that case, the executive engaged in acts, such as grooming, while employed that created a condition for the wrongful act of molestation. However, he committed the wrongful act of molestation, which caused the injury, posttermination. Here, even if we assume the independent contractor became fatigued while completing his contract for M&G, he committed the wrongful acts—failing to stop at a red light, failing to keep a reasonably careful lookout for other vehicles, failing to decrease speed, and driving too fast for conditions—posttermination.

¶ 57       We now turn to count IV, negligent hiring against Texana. We first note that plaintiff is unable to point to any evidence that supports a finding that Texana hired E.G.G. Plaintiff's expert, Morgan, opined only that M&G was negligent in selecting E.G.G.; Morgan did not offer any opinion as to Texana. In fact, plaintiff concedes: "While plaintiff agrees that the preponderance of the evidence does indicate that M&G hired E.G.G., M&G itself denies this. Consequently, [whether Texana hired E.G.G.] is a material fact that is in dispute and should be resolved by a jury, not on summary judgment." Plaintiff also states that one person at M&G, Gonzalez, had an ownership interest in Texana four years prior to the accident. This observation is mere conjecture on plaintiff's part. Mere speculation, conjecture, or guess is insufficient to withstand summary judgment. *Lewis v. Chica Trucking, Inc.*, 409 Ill. App. 3d 240, 251 (2011). Plaintiff failed to raise a genuine issue as to whether Texana hired E.G.G. And, even if Texana had selected E.G.G. to haul the load, the negligence still would have occurred posttermination.

¶ 58                                    III. CONCLUSION

¶ 59       Summary judgment is a drastic remedy to be awarded only where the right of the movant is clear and free from doubt. *Petrovich v. Share Health Plan of Illinois, Inc.*, 188 Ill. 2d 17, 31 (1999). Here, however, it is warranted. There was no agency or hiring relationship between M&G and E.G.G. at the time of E.G.G.'s alleged negligence. E.G.G. was not on M&G's premises, using M&G's equipment, or acting under the direction of M&G. E.G.G. had completed its contracted-for work at the time of the accident. For the reasons stated, we affirm the trial court's grant of summary judgment to M&G and Texana.

¶ 60       Affirmed.