In the

# United States Court of Appeals
### For the Seventh Circuit

No. 10-1943

CLARENDON NATIONAL INSURANCE COMPANY,

*Plaintiff-Appellee,*

*v.*

MARIA MEDINA, GUILLERMO MEDINA,
TOWN TRUCKING COMPANY, JERRY SCHULMAN,
Co-Administrator of the Estate of Michael Walter
Schulman, Deceased, and MARY FALAT-SCHULMAN,
Co-Administrator of the Estate of Michael
Walter Schulman, Deceased,

*Defendants-Appellants.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 08 CV 04245—**Virginia M. Kendall**, *Judge.*

ARGUED NOVEMBER 1, 2010—DECIDED JULY 13, 2011

Before ROVNER, WOOD, and TINDER, *Circuit Judges.*

TINDER, *Circuit Judge.* The trailer of Guillermo Medina's
semi-truck jackknifed across the center line of a slippery
road while he was making a delivery of shingles for

Town Trucking Company, a federally licensed motor carrier. The wayward trailer struck a pickup truck and killed its driver, Michael Walter Schulman. Schulman's parents, as administrators of his estate, brought a wrongful death and survival action in Illinois state court against Town; Guillermo; and Guillermo's wife, Maria Medina, the titular owner of the truck Guillermo was driving at the time of the accident. The suit settled. Pursuant to the settlement agreement, Town's insurance carrier, Occidental Fire & Casualty, who defended the action, paid out the full $1 million policy limit. The agreement also provided that the state court would issue a $2 million consent judgment against Town and the Medinas. Schulman's estate agreed that the payment from Occidental would satisfy the first $1 million of the judgment, while the second $1 million would come, if at all, from an insurance policy Clarendon National Insurance Company issued to Guillermo. Clarendon declined coverage, citing an exclusion in Guillermo's policy. It then sought a declaratory judgment of its liability from the district court for the Northen District of Illinois. The district court found no coverage and granted summary judgment in Clarendon's favor. We affirm.

## I. Background

In early 2006, Guillermo and Maria's son, a commercial truck driver, got a new truck cab. Pursuant to a "family decision," the son transferred ownership of his old truck cab, a 1998 Volvo, to Maria. Maria did not have

a commercial driver's license and was therefore unable to drive the Volvo commercially. Guillermo, however, had a commercial driver's license and several years' experience as a truck driver, which Maria expected him to use to find a trucking job. Armed with the Volvo, his credentials, and Maria's blessing, Guillermo successfully applied for a job with Town Trucking, a Summit, Illinois-based, federally licensed interstate motor carrier for whom his son drove.

The federal regulations governing motor carriers require carriers to either own their trucking equipment or to enter into written leases in which the "owner" of the equipment "grants the use of equipment, with or without driver, for a specified period . . . for use in the regulated transportation of property, in exchange for compensation." 49 C.F.R. § 376.2(e) (defining "lease"); *see also id.* § 376.11 (requiring leases); *id.* § 376.2(d) (defining "owner"). In what the parties agree was at least an attempt to comply with these regulations, Town entered into a nine-page "Contractor Operating Agreement" ("COA") with Guillermo. Pursuant to the COA, Guillermo agreed to furnish the Volvo and a driver (himself) to transport, load, and unload shipments of goods on behalf of Town in exchange for compensation. Maria, the titular owner of the Volvo, did not sign the COA and was not familiar with its terms. She nonetheless testified that she knew Guillermo had signed an agreement with Town and that he had her permission to do so. Maria explained, "He's the one that uses [the Volvo]. He's the one that takes it, and he's the one that files— keeps all the paperwork. And I know that he's doing it. I know it's going on, but he's doing it."

In accordance with federal regulations, *see* 49 C.F.R. §§ 387.7 & 387.9, and as provided for in the COA, Town maintained a $1 million public liability/property damage insurance policy that covered its drivers while they were using their equipment in the furtherance of Town's business. The policy was underwritten by Occidental Fire & Casualty, which agreed to include Guillermo among the policy's insureds. The COA further required Guillermo to obtain "Non-trucking/bobtail liability insurance coverage for bodily injury and property damage" with a policy limit of at least $750,000. Such "bobtail insurance" covers truck drivers while they are "bobtailing," or driving their cabs without trailers outside the service of the federally licensed carriers under whose authority they operate. Town referred Guillermo to a local insurance broker, Insurance Pro, so he could secure a bobtail policy.

With Maria's knowledge and permission, Guillermo visited Insurance Pro and applied for bobtail insurance. He told Insurance Pro that his wife owned the truck but that he would be driving it. Insurance Pro submitted Guillermo's application, which identified him as the insured and indicated to several insurance carriers that the Volvo was "leased to Town Trucking." New Jersey-based Clarendon National Insurance Company agreed to issue Guillermo a policy. Maria wrote a check to cover the annual premium. Insurance Pro issued Guillermo an insurance card in his name.

After obtaining the requisite insurance, Guillermo began working for Town, hauling loads of freight in exchange for per-trip payments that he deposited into

a joint bank account of which Maria was a holder.[1] On November 28, 2006, Town supplied Guillermo with a flatbed trailer and dispatched him and the Volvo to transport several loads of shingles from a manufacturer in Summit, Illinois, to a store in McHenry, Illinois. Guillermo successfully delivered the first load and was returning to Summit with the empty trailer to pick up a second load when the trailer jackknifed over the center line and collided with an oncoming pickup truck. Michael Walter Schulman, the driver of the pickup, sustained fatal injuries in the accident.

Schulman's parents, as co-administrators of his estate, filed a survival and wrongful death action against the Medinas and Town in Illinois state court. Occidental, Town's insurer, defended the action and ultimately settled with Schulman's estate for the full limits of Town's $1 million policy, less some subrogation claims. The settlement agreement also included the entry of a consent judgment of $2 million against the Medinas and Town. The estate agreed that the payment by Occidental satisfied the first $1 million of the consent judgment, and that the second $1 million would be satisfied, if at all, by Guillermo's policy with Clarendon.

---

[1] There is some discrepancy in the record regarding the joint account. Sometimes it is referred to as a joint account held by Maria and Guillermo, and other times as a joint account held by Maria and the Medinas' daughter Elsa. The important point for our purposes is that Maria was one of the account holders.

Clarendon denied coverage. It relied primarily on an exclusion in Guillermo's policy that provided, "[t]his insurance does not apply to . . . [a] covered 'auto' while in the business of anyone to whom the 'auto' is rented." As an alternative basis for its denial, Clarendon alleged that Guillermo failed to notify it of the accident and lawsuit in a timely fashion as required by the policy. Clarendon, properly invoking diversity jurisdiction, *see* 28 U.S.C. § 1332, sought a declaration of its obligations from the district court for the Northern District of Illinois. The parties to that action cross-moved for summary judgment. Defendants Town, the Medinas, and Schulman's estate argued that the exclusion in the Clarendon policy did not apply. They reasoned that the Volvo was not and indeed could not have been "rented" to Town because Guillermo did not own the Volvo and therefore lacked the ability to rent it to anyone. For its part, Clarendon argued that Guillermo had to have rented the Volvo to Town because absent such an arrangement, the Volvo could not have legally been used to transport goods. *See* 49 C.F.R. § 376.11(a).[2]

The district court granted Clarendon's motion and denied the defendants' motion. The district court held that "by operation of federal regulations and basic

---

[2] Both sides also raised arguments concerning the notice (or lack thereof) of the accident and lawsuit that Clarendon received. Because we find that the district court correctly granted summary judgment on the "rented" ground, we need not and do not address the notice issue, which the district court also refrained from deciding.

principles of contract law," the COA constituted a lease such that the Volvo was "rented" to Town at the time of the accident. The district court discussed at length the federal motor carrier regulations governing leases, which it determined the COA materially complied with. It found "it highly implausible that a document which comports with all of the applicable federal regulations for a lease between carrier and lessor was not intended to, in fact, constitute such a lease." The district court was untroubled by Guillermo's lack of titular ownership of the truck because undisputed facts showed that he "used the truck with Maria's express knowledge and permission, and entered into an agreement with Town Trucking regarding its use with her knowledge and permission." It further noted that defendants had not provided any legal authority supporting their theory that only the titular owner of a chattel has the authority to rent it to another.

## II. Discussion

We review the district's resolution of cross-motions for summary judgment de novo. *E.g.*, *Cogswell v. CitiFinancial Mortg. Co.*, 624 F.3d 395, 398 (7th Cir. 2010). In doing so, we construe all reasonable inferences in favor of the party against whom the motion under consideration was made. *Id.* Here, that is the defendants. Summary judgment is appropriate only if the movant—Clarendon—"shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

The parties agree that Illinois law governs this diversity action (notwithstanding the emphasis they place on the federal motor carrier regulations). In Illinois, insurance policies are contracts; the general rules governing the interpretation and construction of contracts govern the interpretation and construction of insurance policies. *Hobbs v. Hartford Ins. Co. of the Midwest*, 823 N.E.2d 561, 564 (Ill. 2005). Illinois courts aim to ascertain and give effect to the intention of the parties, as expressed in the policy language, so long as doing so does not contravene public policy. *Id.* In doing so, they read the policy as a whole and consider the type of insurance purchased, the risks involved, and the overall purpose of the contract. *State Farm Mut. Auto. Ins. Co. v. Villicana*, 692 N.E.2d 1196, 1199 (Ill. 1998). If the policy language is unambiguous, courts apply it as written. *Hobbs*, 823 N.E.2d at 564. Policy terms that limit an insurer's liability are liberally construed in favor of coverage, but only when they are ambiguous, or susceptible to more than one reasonable interpretation. *Id.*; *see also Rich v. Principal Life Ins. Co.*, 875 N.E.2d 1082, 1090 (Ill. 2007).

The defendants assert that the policy exclusion on which Clarendon relies should be construed in their favor because it is ambiguous. Not only is calling this exclusion ambiguous a somewhat dubious proposition, *see Hartford Ins. Co. of the Se. v. Occidental Fire & Cas. Co.*, 908 F.2d 235, 238-39 (7th Cir. 1990); *St. Paul Fire & Marine Ins. Co. v. Frankart*, 370 N.E.2d 1058, 1061 (Ill. 1977), doing so is of dubious applicability in this case. Policy provisions, including exclusions, are only ambiguous when reasonable minds could differ about what they

mean. *See Hobbs*, 823 N.E.2d at 564. But there is no dispute over what the policy exclusion means. The heart of the parties' dispute is how the language of the exclusion should be applied; that is, whether the Volvo could be or was in fact "rented." "The fact that contractual language may, on occasion, pose difficult factual applications does not make that language ambiguous." *Hartford Ins. Co.*, 908 F.2d at 239; *see also Rich*, 875 N.E.2d at 1090. Because there is no ambiguity, we read and apply the exclusion according to its plain terms.

The plain terms of the exclusion render the policy—which Guillermo and Clarendon both understood to afford limited bobtail coverage—inapplicable to "[a] covered 'auto' while in the business of anyone to whom the 'auto' is rented." Most challenges to similarly worded exclusions focus on whether the truck at issue was "in the business" of the motor carrier at the time of the incident for which coverage is claimed. *See, e.g.*, *Frankart*, 370 N.E.2d at 1060 ("The issue before this court is whether . . . the tractor-trailer was still being used in the business of Wilson at the time of the accident, thereby excluding coverage . . . ."); *Empire Fire & Marine Ins. Co. v. Liberty Mut. Ins. Co.*, 699 A.2d 482, 497 (Md. Ct. Spec. App. 1997) (collecting cases). Here, though, the defendants' sole contention is that the covered auto, the Volvo, was not "rented" to Town because Guillermo rather than Maria signed the COA. They do not dispute that Guillermo was "in the business" of Town at the time of the accident; doing so would have almost certainly been futile. *See Frankart*, 370 N.E.2d at 1061 (interpreting similar policy and holding "the policy clearly

provides that coverage is excluded when [insured's] trailer is being used in the business of a lessee even if, at the time of the accident, the tractor is pulling an empty trailer"). Instead, they argue that the COA "is not a lease because it was not made between Town Trucking and the undisputed owner of the equipment: Maria." As before the district court, they have not cited any legal authority in support of this contention. Instead, they claim that because the federal regulations provide that "[t]he lease shall be made between the authorized carrier and the owner of the equipment," 49 C.F.R. § 376.12(a), the COA cannot be a lease within the meaning of those regulations.

Despite their unnecessarily heavy reliance on the federal regulations, *see Occidental Fire & Ins. Co. of N. Carolina v. Padgett*, 446 N.E.2d 937, 940 (Ill. App. Ct. 1983) (recognizing that federal motor carrier regulations are instructive but not controlling in context of insurance policy interpretation), the parties completely ignore a regulation that would vitiate defendants' "non-owners cannot be lessors" theory. 49 C.F.R. § 376.2(d)(2) defines "owner" for the purposes of the regulations more broadly than the defendants would have it; an "owner" includes someone like Guillermo, "who, without title, has the right to exclusive use of equipment." There is no dispute that Maria entrusted Guillermo with exclusive use of the truck, or that he had her permission to do whatever was necessary to ensure that he could legally drive it to earn money, including obtaining licenses, paying taxes, entering agreements, and procuring insurance.

The defendants instead dispute the relevance of even the portion of 49 C.F.R. § 376.12(a) that permits "authorized representatives" of owners to enter into leases with motor carriers. They contend that the COA "is devoid of any indication that Guillermo is acting as anyone else's 'authorized representative.'" They are correct to the extent that the COA does not mention Maria or identify Guillermo as signing on behalf of anyone. The absence of such a line in a contract, however, does not necessarily mean that the signatories are acting exclusively in their own interests. Illinois recognizes that a party may act as an agent on behalf of an undisclosed principal such that a third party does not know that the agent is contracting on another's behalf. *See Kimco Corp. v. Murdoch, Coll & Lillibridge, Inc.*, 730 N.E.2d 1143, 1146 (Ill. App. Ct. 2000). So even though it is undisputed that Town was unaware that Maria held title to the Volvo when it entered the COA with Guillermo, it does not follow that Guillermo could not have legitimately been acting on her behalf.

"The question of whether an agency relationship exists is normally a question of fact." *Ioerger v. Halverson Constr. Co.*, 902 N.E.2d 645, 648 (Ill. 2008). "A court may decide the issue as a matter of law, however, if only one conclusion may be drawn from the undisputed facts." *Id.* Here, the district court did just that. The undisputed facts show that Maria and Guillermo had an agency relationship. The relationship did not arise by virtue of their marriage, *see Capital Plumbing & Heating Supply Co. v. Snyder*, 275 N.E.2d 663, 666 (Ill. App. Ct. 1971) ("Marriage, although it creates a contractual relationship,

does not create one of principal and agent."), but rather through the nature of their actions regarding the Volvo. Generally, an agency relationship arises when "one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act." *Restatement (Third) of Agency* § 1.01 (2006); *see also Taylor v. Kohli*, 642 N.E.2d 467, 468 (Ill. 1994) ("The agency relationship is a consensual, fiduciary one between two legal entities, where the principal has the right to control the conduct of the agent and the agent has the power to affect the legal relations of the principal."). After Maria gained ownership of the truck, she and Guillermo made a family decision to put it in her name but have him drive it. Maria gave Guillermo permission to seek employment and sign the COA with Town; she gave him permission—and funding—to get an insurance policy; he received payment for his efforts and deposited them into an account over which Maria had joint control. Maria held the purse strings, and Guillermo did the legwork. It matters not that Guillermo gained some benefit from the arrangement; he kept Maria abreast of everything he was doing with respect to the truck and she either explicitly or implicitly approved it. *See Restatement (Third) of Agency* §§ 8.02, 8.06(1).

The existence of an agency relationship means it was possible for Guillermo to have entered into a lease with Town and to subject Maria to liability by doing so. The next question we need resolve is whether the district court erred in concluding that the COA was a

lease as a matter of law. In Illinois, leases are treated no differently than other written contracts. *Williams v. Nagel*, 643 N.E.2d 816, 822 (Ill. 1994). And to have a valid contract, "an agreement between competent parties, upon a consideration sufficient in law, to do or not to do a particular thing," in Illinois, the only things necessary are an offer, an acceptance, and consideration. *Steinberg v. Chi. Med. Sch.*, 371 N.E.2d 634, 639 (Ill. 1977) (quoting *People v. Dummer*, 113 N.E. 934, 935 (Ill. 1916)). All of the requisite elements were indisputably present here. Guillermo offered Town use of the Volvo and his driving services; Town accepted; the parties agreed that Guillermo would haul freight for Town and obtain insurance to do so, and in return Town would provide Guillermo with additional insurance coverage and compensation. Further, despite defendants' arguments to the contrary, we see no reason why enforcing the COA—and consequently applying the "rented" exclusion—would contravene public policy.

Illinois courts have a "long tradition of upholding the right of parties to freely contract" and declare contractual provisions void as contrary to public policy only when they are "manifestly injurious to the public welfare" or "clearly contrary to what the constitution, the statute or the decisions of the courts have declared to be the public policy." *Mohanty v. St. John Heart Clinic, S.C.*, 866 N.E.2d 85, 92 (Ill. 2006) (quotations omitted). The defendants have not shown how the COA or the exclusion in the Clarendon policy meets those exacting criteria. They claim that finding a lease and thereby applying the otherwise undisputedly valid exclusion would prevent the driving public, namely Schulman's estate,

from being adequately compensated for injuries sustained in trucking accidents. The federal motor carrier regulations, however, require carriers to maintain minimum levels of insurance coverage such that the driving public is sufficiently protected from trucking accidents. *See* 49 C.F.R. §§ 387.7 & 387.9. There have been no accusations that Town's policy with Occidental or Guillermo's policy with Clarendon failed to meet these standards. We recognize that no amount of money could ever be adequate to compensate the Schulmans for the loss of their son. But we also recognize that competent, consenting parties must be able to contract and rely on the agreements they reach. Guillermo and Clarendon both intended the policy, which cost less than a full liability policy, to be a "bobtail" policy that would not cover Guillermo while he was hauling freight for Town. And Guillermo, Town, and Clarendon all operated as though the Volvo was "rented" to Town; Town and Guillermo executed the COA, and Guillermo indicated to Clarendon on his insurance application that the truck was "leased to Town Trucking." Ignoring these (and other) facts to find the exclusion inapplicable would interfere with the parties' expectations, hamper the operation of two facially valid contracts, and harm rather than advance public policy.

### III. Conclusion

For the foregoing reasons, the judgment of the district court is AFFIRMED.