In the

# United States Court of Appeals
## For the Seventh Circuit

No. 20-2962

CONTINENTAL WESTERN INSURANCE COMPANY,

*Plaintiff-Appellee,*

*v.*

COUNTRY MUTUAL INSURANCE COMPANY,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Southern District of Illinois.
No. 17-cv-01231 — **Nancy J. Rosenstengel**, *Chief Judge.*

ARGUED APRIL 21, 2021 — DECIDED JUNE 24, 2021

Before FLAUM, SCUDDER, and KIRSCH, *Circuit Judges.*

FLAUM, *Circuit Judge.* In the aftermath of a serious collision between an ambulance and semi-truck, a question lingered: Who owned the ambulance? This inquiry turned contentious as two insurance companies looked to sidestep primary coverage obligations arising from three post-accident lawsuits. The ambulance service's formation through a joint enterprise and status as a separately insured party complicated the resultant ownership determination. The district court

determined that defendant-appellant Country Mutual Insurance Company's named insured owned the ambulance, holding Country Mutual responsible for primary coverage for the defense costs in question. Accordingly, the district court found that plaintiff-appellee Continental Western Insurance Company's named insured did not own the ambulance such that Continental only owed coverage in excess of Country Mutual's primary coverage. After granting summary judgment to Continental on these grounds, the court awarded Continental attorney's fees and defense costs equal to the amounts that Country Mutual should have covered but that Continental, in fact, incurred to defend its insured in the three underlying lawsuits. Considering the record evidence strongly reflects the parties' intent that Country Mutual's insured owned the ambulance and considering the reasonableness of the resulting award of attorney's fees under Illinois law, we affirm the district court.

## I.  Background

### A. Factual Background

Alhambra and Hamel are two villages located in southern Illinois. In 1989, the Hamel Fire Protection District ("Hamel Fire") and Alhambra Fire Protection District ("Alhambra Fire") formed a joint venture called the Alhambra-Hamel Ambulance Service (the "Service") to provide ambulance service to residents of both fire districts.

On September 17, 2012, a Service-operated ambulance driven by Theodore Berg, Jr., collided with a semi-truck owned by Specialized Transportation, Inc. (hereinafter, the "accident"). The semi-truck driver Daniel Eddinger and his codriver Rayburn Conway were seriously injured in the

accident. Ambulance passengers, including Michelle Logue, were also severely injured.

The accident produced three lawsuits (hereinafter, the "underlying lawsuits").[1] Continental defended Hamel Fire in each of the underlying lawsuits but only after first tendering them to Country Mutual. Country Mutual ignored each tender. All three cases eventually settled, and Continental paid all attorney's fees assessed for Hamel Fire's defenses.

The question before us now is which insurance company—Continental or Country Mutual—is responsible for paying the defense fees that Continental incurred to defend Hamel Fire in the underlying lawsuits. The parties agree this question turns exclusively on who owned the ambulance involved in the accident, a 2010 Freightliner Ambulance with a vehicle identification number 1FVACWDU2ADAN8141 (hereinafter, the "ambulance").

Several documents shed light on which entity owned the ambulance. On the one hand, the 2009 "Certificate of Title of a Vehicle" for the ambulance listed "Alhambra Hamel Ambulance Service" as its "owner." Likewise, the 2009 "Bill of Sale" issued by Truck Centers, Inc. listed the ambulance as "Sold To: Alhambra-Hamel Ambulance Service." Finally, the "Illinois Traffic Crash Report" that recorded the accident listed the ambulance "owner" as "Alhambra Hamel, Ambulance Service." On the other hand, when they formed the Service in

---

[1] The three lawsuits were entitled: (1) *Rayburn Conway, et al. v. Alhambra-Hamel Ambulance Service, et al.*; (2) *Eddinger v. Alhambra-Hamel Ambulance Service, et al.*; and (3) *Logue v. Eddinger, et al.*, which then led to a third-party complaint entitled *Specialized Transportation, Inc. v. Alhambra-Hamel Ambulance Service, et al.*

1989, Hamel Fire and Alhambra Fire reached an "Agreement to Provide Ambulance Service Jointly." That 1989 agreement contained an "Ownership of Property" provision: "All property; both real and personal, acquired by Alhambra and Hamel hereunder shall be owned equally by them." Country Mutual also provided an affidavit from Hamel Fire's treasurer who attested to the contents of the agreement.

The insurance policies issued by Continental and Country Mutual, both in effect during the accident, also speak to ambulance ownership and coverage priority. At a high level, there were four insurance policies implicated by the accident. Of those, only the ones issued by Country Mutual (to its insured, the Service) and Continental (to its insured, Hamel Fire) are relevant.[2]

Turning to the specifics of each policy, we begin with Country Mutual's policy. Country Mutual issued a multi-peril commercial lines insurance policy to the Service, its named insured, for a period of December 24, 2011, to December 24, 2012 (the "Country Mutual Policy"). The Country Mutual Policy included business auto coverage subject to a $1,500,000 limit of liability for any one accident or loss, but it only insured certain "covered autos." Under "Item 3. – Schedule of Covered Autos You Own," the Country Mutual Policy listed the "2010, Freightliner Ambulance, 1FVACWDU2ADAN8141," specifying the ambulance was a covered auto.

The Country Mutual Policy stated the company "will pay all sums an 'insured' legally must pay" in applicable damages. In addition to covering the Service, the Country Mutual

_____

[2] Alhambra Fire had a separate insurance policy not now at issue.

Policy also circuitously covered Hamel Fire. In clarifying who was insured under the Country Mutual Policy, the "Liability Coverage" section stated that "insureds" span three categories: "[y]ou for any covered 'auto,'" "[a]nyone else while using with your permission a covered 'auto' you own, hire or borrow," and "[a]nyone liable for the conduct of any 'insured' described above but only to the extent of that liability."

Under this framework, the Country Mutual Policy insured the Service (as the primary policy holder), Berg (as the driver of a covered auto with the Service's permission), and Hamel Fire (as one allegedly liable for the conduct of its "agent and driver" or "employee"—Berg—who qualifies as an "insured"). The district court accepted and Country Mutual did not challenge in its briefing or at oral argument that Hamel Fire consequently enjoyed coverage under the Country Mutual Policy. On appeal, we thus accept that as given.

We turn next to Continental's policy, which Continental issued to Hamel Fire, its named insured, for a period of September 4, 2012, to September 4, 2013 (the "Continental Policy"). The Continental Policy included business auto coverage subject to a $5,000,000 limit of liability for any one accident or loss. Unlike the Country Mutual Policy, the Continental Policy did *not* list the ambulance under its own "Item Three - Schedule of Covered Autos You Own," although it listed six unrelated vehicles. Nevertheless, the ambulance was still an "auto" covered by virtue of the Continental Policy's declarations, which stated that any "auto" enjoyed coverage. All told, both parties do not dispute that the ambulance was a covered auto under both the Continental Policy and Country Mutual Policy.

Both policies also spelled out coverage priority in comparably worded "Other Insurance" provisions. In the Country Mutual Policy, the "Other Insurance" provision stated: "For any covered 'auto' you own, this Coverage Form provides primary insurance. For any covered 'auto' you don't own, the insurance provided by this Coverage Form is excess over any other collectible insurance." Similarly, the Continental Policy's "Other Insurance" provision (as modified by another form) stated: "For any covered 'auto' you own and any 'commandeered auto', this endorsement provides primary insurance. For any covered 'auto' you don't own, the insurance provided by this endorsement is excess over any other collectible insurance." Thus, both policies provided primary coverage for owned autos and excess coverage for non-owned autos.

## B.  Procedural Background

Asserting that it was entitled to reimbursement of the attorney's fees it paid to defend Hamel Fire in the underlying lawsuits, Continental sued Country Mutual in federal district court, invoking the court's diversity jurisdiction.

The district court granted Continental's motion for summary judgment because, in the court's view, the Service, and not Hamel Fire, owned the ambulance. Based on that finding, and both policies' "Other Insurance" clauses, the court determined that Country Mutual owed primary coverage for the costs to defend Hamel Fire in the underlying lawsuits, while Continental only owed excess coverage. Therefore, the court entered a judgment in a civil action instructing that "Country Mutual had a duty to defend Hamel Fire in the underlying lawsuits, including the duty to reimburse Continental for the cost of defending Hamel Fire."

Country Mutual next filed a notice of appeal to this Court. We sent the case back to the district court, however, with instruction to calculate damages. Back in the district court, the parties litigated the issue of attorney's fees and defense costs with full briefing and oral argument. In an attempt to challenge Continental's desired damages, Country Mutual sought an evidentiary hearing and attempted to introduce an affidavit by Stephen Mudge, the Service's lead attorney in the underlying lawsuits. The district court ultimately denied both requests: the former as unnecessary and the latter as untimely. The district court then awarded attorney's fees and defense costs in the amount of $240,146.18, in addition to prejudgment interest of $10,394.72, for a total of $250,540.90. The court denied Continental's request for post-judgment interest but also stated that "upon the entry of an amended judgment in this case, post-judgment interest will begin accruing at the rate established by 28 U.S.C. § 1961." Country Mutual now appeals, challenging the district court's entry of summary judgment and award of attorney's fees.

## II.   Discussion

### A.  Motion for Summary Judgment

Country Mutual first argues that the district court erred in granting Continental summary judgment. "We review a district court's grant of summary judgment de novo, viewing the record in the light most favorable to the non-moving party and drawing all reasonable inferences in that party's favor." *McAllister v. Innovation Ventures, LLC*, 983 F.3d 963, 967 (7th Cir. 2020). Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A

genuine dispute of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The parties agree that Illinois law applies in this diversity action.

We limit our analysis in this section to what both parties agree is the outcome-determinative question: Which entity owned the ambulance, either the Service exclusively, as Continental argues, or Hamel Fire and Alhambra Fire jointly, as Country Mutual argues? Both policies' "Other Insurance" provisions expressly dictate that the insurer for whichever entity owned the ambulance owed primary coverage for defending Hamel Fire in the underlying lawsuits. *See also Vedder v. Cont'l W. Ins. Co.*, 978 N.E.2d 1111, 1116 (Ill. App. Ct. 2012) ("[P]rimary liability is generally placed on the insurer of the owner of an automobile" in Illinois. (citing *State Farm Mut. Auto. Ins. Co. v. Universal Underwriters Grp.*, 695 N.E.2d 848, 851 (Ill. 1998))). That, in turn, determines whether Country Mutual had a legal obligation to reimburse the costs Continental incurred to defend Hamel Fire. *See Kajima Const. Servs., Inc. v. St. Paul Fire & Marine Ins. Co.*, 879 N.E.2d 305, 308 (Ill. 2007) ("Illinois courts … apply horizontal exhaustion, which requires an insured who has multiple primary and excess policies covering a common risk to exhaust all primary policy limits before invoking excess coverage."). We ultimately hold the district court did not err in granting Continental's motion for summary judgment because the record evidence indicates that the involved parties intended for the Service to be the sole ambulance owner.

Under Illinois law, answering the ownership question requires us to determine which entity the parties intended to be the ambulance owner. *Sheary v. State Farm Mut. Auto. Ins. Co.*, 566 N.E.2d 794, 795 (Ill. App. Ct. 1991). ("[O]wnership for insurance purposes is governed by the intent of the parties" and "determined as of the time of the collision."). Here, interpreting the parties' insurance policies as well as other documents bears on their intent. *See Jadczak v. Mod. Serv. Ins. Co.*, 503 N.E.2d 794, 797–98 (Ill. App. Ct. 1987) (insurance policies and purchase history); *Pekin Ins. Co. v. U.S. Credit Funding, Ltd.*, 571 N.E.2d 769, 771 (Ill. App. Ct. 1991) (certificate of title); *see also Ind. Ins. Co. v. Pana Cmty. Unit Sch. Dist. No. 8*, 314 F.3d 895, 901 (7th Cir. 2002) ("Illinois law requires that provisions of an insurance agreement be interpreted in the factual context of the case." (citing *Putzbach v. Allstate Ins. Co.*, 494 N.E.2d 192, 195 (Ill. App. Ct. 1986))).

To understand the parties' insurance policies, "the general rules governing the interpretation and construction of contracts govern" because "insurance policies are contracts." *Clarendon Nat'l Ins. Co. v. Medina*, 645 F.3d 928, 933 (7th Cir. 2011) (citing *Hobbs v. Hartford Ins. Co. of the Midwest*, 823 N.E.2d 561, 564 (Ill. 2005)). Illinois courts strive to "ascertain and give effect to the intention of the parties, as expressed in the policy language, so long as doing so does not contravene public policy." *Id.* (citing *Hobbs*, 823 N.E.2d at 564). "If the policy language is unambiguous, courts apply it as written." *Id.* (citing *Hobbs*, 823 N.E.2d at 564). Finally, Illinois courts must examine both policies' "other insurance" provisions to determine how "[t]he loss will be allocated" between coinsurers. *Bituminous Cas. Corp. v. Royal Ins. Co. of Am.*, 704 N.E.2d 74, 79 (Ill. App. Ct. 1998).

In this case, both the Country Mutual Policy and the Continental Policy reflect the view that the parties intended the Service, not Hamel Fire, as the ambulance owner. To begin, the Country Mutual Policy designated the Service as the ambulance owner. The Country Mutual Policy unambiguously included the ambulance under the "Item 3. - Schedule of Covered Autos You Own." *See Schuster v. Occidental Fire & Cas. Co. of N. Am.*, 30 N.E.3d 458, 465 (Ill. App. Ct. 2015) (finding a similar "Item Three—Schedule of Covered Autos You Own" was "plain and unambiguous"). Even alone, this schedule evidences the Service's intended ownership of the ambulance and, therefore, Country Mutual's primary liability because Illinois courts generally place primary liability on the insurer of the automobile owner. *See Vedder*, 978 N.E.2d at 1116. Lest there be any doubt, however, the Country Mutual Policy's "Other Insurance" provision adds that "for any covered 'auto' you own"—and the above-referenced schedule lists the ambulance as one such covered auto owned by the Service—the Country Mutual Policy "provides primary insurance."

Notably, Country Mutual nowhere documented the view it advances now that the Service did not own—and that Hamel Fire and Alhambra Fire co-owned—the ambulance. Country Mutual is correct that insurers do not have a "general duty to investigate the truthfulness of answers given to questions asked on an application for insurance." *Brandt v. Time Ins. Co.*, 704 N.E.2d 843, 846 (Ill. App. Ct. 1998). However, Country Mutual's contention that "Country Mutual's intent, if any, is simply not relevant," is perplexing. Essentially, Country Mutual argues that one of its own insurance policies means the exact opposite of what it says. In other words, Country Mutual would have us decide that the Service did not own the ambulance, deeming Country Mutual's express

contractual language stating that the Service owned the ambulance a lie. We decline to adopt a view so contrary to the plain language found in the Country Mutual Policy. Regardless of Country Mutual's intent, the Country Mutual Policy is still highly relevant to show the *Service's* own intention of ownership of the ambulance.

Consistent with the parties' intent that the Service owned the ambulance in accord with the Country Mutual Policy, the Continental Policy's "Schedule of Covered Autos You Own"—with the "You" now referring to Hamel Fire—did *not* list the ambulance as an owned auto. This omission indicates Continental's and Hamel Fire's intentions that Hamel Fire did not own the ambulance, for the simple fact that if Hamel Fire did own the ambulance, then both parties would have said so on the schedule of "Autos *You Own*." (Emphasis added). It follows from this exclusion that, under the "Other Insurance" provision, Continental only owed Hamel Fire excess coverage above Country Mutual's primary coverage. *See Kajima*, 879 N.E.2d at 308. Therefore, whether we focus on the intentions of the Service (and Country Mutual) or Hamel Fire (and Continental), the plain language of the two insurance policies at issue underscores that all relevant parties intended for the Service, not Hamel Fire, to own the ambulance.

Beyond the insurance policies, three other documents reinforce our view that the Service, and not Hamel Fire, owned the ambulance. First, in 2009, the Service, not Hamel Fire, purchased the ambulance. Per the ambulance's Bill of Sale, Truck Centers, Inc. "sold" the ambulance to "Alhambra-Hamel Ambulance Service." Second, the Service, not Hamel Fire, memorialized its ownership of the ambulance by securing the 2009 Certificate of Title, which listed "Alhambra Hamel

Ambulance Service" as the "owner." Then, as discussed in detail above, the Service, not Hamel Fire, took out the 2011 insurance policy with Country Mutual specifically listing the ambulance as an "auto" that the Service owned. Third, the 2012 Illinois Traffic Crash Report stated that the "vehicle owner" was "Alhambra Hamel, Ambulance Service." Each of these documents support the Service's ownership of the ambulance, leaving us unconvinced by Country Mutual's argument on appeal that "the ambulance was purchased, paid for, maintained, owned and controlled at all times by [Alhambra Fire] and [Hamel Fire]."

Deflecting away from these compelling indications of intent, Country Mutual argues that the district court improperly placed the burden on Country Mutual to prove that Hamel Fire owned the ambulance. However, the district court was correct to hold Country Mutual to that burden because Illinois courts have "[a] *prima facie* presumption of ownership [that] arises from a certificate of title," which "may be rebutted by competent evidence of actual ownership." *Pekin*, 571 N.E.2d at 771 (citing *Klein v. Pritikin*, 285 N.E.2d 457, 460 (Ill. App. Ct. 1972)). Although not "conclusive" evidence, because "one can own an automobile though the certificate of title is in the name of another," a certificate of title is still "*evidence* of title." *Id.* (quoting *State Farm Mut. Auto. Ins. v. Lucas*, 365 N.E.2d 1329, 1332 (Ill. App. Ct. 1977)). Therefore, Country Mutual needed, but failed, to rebut the presumption that the Service owned the ambulance because the Certificate of Title states as much.

The best evidence that Country Mutual offers to suggest that Hamel Fire owned the ambulance is Alhambra Fire and Hamel Fire's 1989 agreement that created the Service. In that

agreement, the parties agreed that "All property; both real and personal, acquired by Alhambra [Fire] and Hamel [Fire] hereunder shall be equally owned by them." Country Mutual believes the 1989 agreement is dispositive as it is the "only evidence of intent," ignoring of course all the above-referenced polices and documents. Country Mutual also relies on the affidavit of Hamel Fire's treasurer, which parrots that the "[a]mbulance was jointly owned in equal shares by Hamel [Fire] and Alhambra [Fire]" based on the 1989 agreement.

Whatever force this agreement might have had in speaking to the parties' initial intentions in 1989, by 2012—"as of the time of the collision" from which we must examine the parties' intentions—there was overwhelming and overriding evidence that the parties intended for the Service to own the ambulance. *See Sheary*, 566 N.E.2d at 795. Through the twenty-some intervening years after the initial 1989 agreement, the parties' intentions evolved. Had intentions not shifted, the parties would not have taken out insurance policies providing that the Service owned, and Hamel Fire did not own, the ambulance, nor would the Certificate of Title and Bill of Sale both say that the Service owned the ambulance. Even if the 1989 agreement's intention that "Alhambra [Fire] and Hamel [Fire]" would "equally own[]" property acquired under that agreement governed, Country Mutual does not explain how that directive applies here.

Country Mutual has therefore not sufficiently "rebutted" by "competent evidence of *actual* ownership" the presumption that the Service owned the ambulance. *Pekin*, 571 N.E.2d at 771 (emphasis added). Stated differently, based solely on the dated 1989 agreement and a self-serving affidavit regurgitating that agreement, "a reasonable jury could [not] return

a verdict for [Country Mutual]" because there was not a genuine issue of material fact as to which entity owned the ambulance. *Skiba*, 884 F.3d at 717 (quoting *Anderson*, 477 U.S. at 248). Accordingly, we affirm the district court's grant of summary judgment.

### B.  Attorney's Fees and Defense Costs

Country Mutual next argues that the district court erred in awarding Continental attorney's fees and defense costs equal to the amount Continental spent to defend Hamel Fire in the underlying suits. Country Mutual primarily challenges the reasonableness of that award, but we will first address some evidentiary decisions that Country Mutual's appeal implicates.

### 1.  *District Court's Evidentiary Rulings*

Country Mutual argues that "[b]y ignoring and striking the affidavit of Steve Mudge and refusing to have an evidentiary hearing, the trial court created a new standard on fee petitions of just requiring a submission of time entries with a statement that they have been paid, which is not the standard for fee petitions requiring that the entire award be vacated." We review both decisions for an abuse of discretion. *See Magyar v. Saint Joseph Reg'l Med. Ctr.*, 544 F.3d 766, 770 (7th Cir. 2008) (affidavit); *Royce v. Michael R. Needle P.C.*, 950 F.3d 481, 487 (7th Cir. 2020) (evidentiary hearing).

First, as to the stricken affidavit, we have repeatedly held that a district court acts properly when it enforces deadlines. *See, e.g.*, *Spears v. City of Indianapolis*, 74 F.3d 153, 157 (7th Cir. 1996). "Moreover, even arguments that have been raised [in the district court] may still be waived on appeal if they are

underdeveloped, conclusory, or unsupported by law." *Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 718 (7th Cir. 2012).

On this issue, the district court said that two days before the damages oral argument:

> [W]ithout any advance notice or leave of Court, Country Mutual filed an affidavit from Stephen Mudge, an attorney who represented Country Mutual's insured in the Underlying Lawsuits. The affidavit purported to dispute the accuracy of several billing entries in Continental's billing records.
>
> … [T]he Court heard argument on the issue of damages. Because Country Mutual's affidavit was filed out of time and without leave of Court—and with no explanation as to why it was being filed—the Court struck the affidavit from the record.

(Citations omitted).

The court's decision to enforce its deadlines and rules for submitting affidavits was not an abuse of discretion. *See Spears*, 74 F.3d at 157. Even if enforcing deadlines may sometimes be an abuse of discretion, Country Mutual built no argument for such a finding here. On appeal, Country Mutual again provides no reason for why it should have been allowed to untimely and improperly file the Mudge affidavit, and it does not engage with the district court's reasoning, so the argument is waived. *See Puffer*, 675 F.3d at 718.

Second, as to the stricken evidentiary hearing, we have held "it is not an abuse of discretion to decline to conduct an evidentiary hearing 'that would only address arguments and

materials already presented to the court in the parties' briefings.'" *Royce*, 950 F.3d at 487 (quoting *Pickett v. Sheridan Health Care Ctr.*, 664 F.3d 632, 652 (7th Cir. 2011)). The district court ultimately struck the evidentiary hearing because Country Mutual already had "ample opportunity to provide any evidence and to set forth any and all objections to the claimed attorneys' fees and defenses costs within its briefing." As discussed in greater detail below, the district court had considerable evidence from Continental to support its award of attorney's fees. Country Mutual could have challenged that evidence however it pleased at the appropriate time. As Country Mutual opted not to take that opportunity, the court was free to foreclose an opportunity for Country Mutual to provide evidence anew. *See id.*

### 2. District Court's Award of Attorney's Fees and Defense Costs

More directly, Country Mutual challenges the district court's award of attorney's fees and defense costs as unreasonable. Because "[d]istrict courts have wide discretion in determining the appropriate amount of attorneys' fees and costs," our review "is limited to a highly deferential abuse of discretion standard." *Spegon v. Cath. Bishop of Chi.*, 175 F.3d 544, 550 (7th Cir. 1999).

In Illinois, fee awards must always be reasonable, *see Platinum Supplemental Ins., Inc. v. Guarantee Tr. Life Ins. Co.*, 989 F.3d 556, 571 & n.7 (7th Cir. 2021) (citing *Powers v. Rockford Stop-N-Go, Inc.*, 761 N.E.2d 237, 240 (Ill. App. Ct. 2001)), and "the party seeking the fees … always bears the burden of presenting sufficient evidence from which the trial court can render a decision as to their reasonableness." *Kaiser v. MEPC Am. Props., Inc.*, 518 N.E.2d 424, 427 (Ill. App. Ct. 1987).

However, the attorney's fees in this case were paid, and Illinois courts have said "[t]he *prima facie* reasonableness of a paid bill can be traced to the enduring principle that the free and voluntary payment of a charge for a service by a consumer is presumptive evidence of the reasonable or fair market value of that service." *Arthur v. Catour*, 833 N.E.2d 847, 854 (Ill. 2005) (citing cases); *see also Pickett*, 664 F.3d at 653–54 (noting, albeit in the context of federal law, that the "best evidence of whether attorney's fees are reasonable is whether a party has paid them." (quoting *Cintas Corp. v. Perry*, 517 F.3d 459, 469–70 (7th Cir. 2008))).

Here, Continental presented the district court with detailed line-item entries for all its bills paid to defend Hamel Fire in the underlying lawsuits. Continental also furnished an affidavit by an employee, Keith Keller, confirming that Continental paid them.[3] Thus, the district court's award of that amount was presumptively reasonable. *See id.*

Setting aside the evidence that the bills were paid, we conclude the district court's award of $240,146.18 in attorney's fees and defense costs was reasonable—and therefore not an abuse of discretion. Country Mutual has failed to show otherwise. Under Illinois law, a "petition for fees must specify the services performed, by whom they were performed, the time expended thereon and the hourly rate charged therefor."

---

[3] In light of the line-item entries and other evidence presented by Continental, we are unpersuaded by Country Mutual's argument that various documents failed to satisfy Continental's burden. What is more, on appeal we are not concerned with whether Continental in fact met its burden but rather whether the district court *abused its discretion* in finding that Continental satisfied that burden, a highly deferential bar. *See Spegon*, 175 F.3d at 550.

*Kaiser*, 518 N.E.2d at 427. A "mere compilation of hours multiplied by a fixed hourly rate or bills issued to the client" is typically insufficient. *Id.* Additionally, a trial court must consider a host of factors to arrive at a reasonable award, including "the skill of the lawyers, the difficulty and importance of the case, usual charges for similar services, the benefit to the client, and 'whether there is a reasonable connection between the fees and the amount involved in the litigation.'" *Abellan v. Lavelo Prop. Mgmt., LLC*, 948 F.3d 820, 835 (7th Cir. 2020) (quoting *Kaiser*, 518 N.E.2d at 427–28); *Kaiser*, 518 N.E.2d at 428 (instructing courts to also consider "the nature of the case" and "degree of responsibility required").

The district court began by noting how Continental "provided detailed billing records for the attorneys who provided the defense to Hamel Fire" to support the $240,146.18 of attorney's fees and defense costs requested. This amount reflected attorney's fees Continental paid to two law firms ($20,466.94 and $180,010.30) as well as $39,669.02 in defense costs.[4]

With respect to the attorney's fees, far from a "mere compilation of hours multiplied by a fixed hourly rate," *Kaiser*, 518 N.E.2d at 427, Continental provided the district court with hundreds of pages of exhibits containing line entries for every dollar of fees it incurred to defend Hamel Fire in the underlying lawsuits. Each entry contained the name of the attorney performing the task, the line-item number, the task

---

[4] Our calculation of these amounts ($20,466.94 + $180,010.30 + $39,669.02) resulted in $240,146.*26*, not the $240,146.*18* that the district court awarded. Given the *de minimis* difference of eight cents and the affirmative miscalculations Continental provided the district court in its Brief Regarding the Calculation of Damages, we deem any potential challenge to the calculation of the fees on this basis waived.

date, the fee-approval date, a description of work, the time spent on the task, the hourly rate charged, and the total amount billed. Therefore, Continental's specifications satisfied its obligation to detail "the services performed, by whom they were performed, the time expended thereon and the hourly rate charged therefor." *Id.*

With respect to the $39,669.02 in defense costs, the court noted how Continental "submitted documentation of all defense fees and costs it paid in defending Hamel Fire." As the court summarized, Keller attested in his affidavit that Continental incurred these costs for "court reporting, professional medical record review and analysis, printing services, and forensic crash analysis costs." Continental's brief to the district court also contained an item-by-item breakdown of the corresponding amounts paid.

Without basis, Country Mutual argues that Continental's records were deficient. It contends that Continental's billing entries reflected multiple attorneys improperly performing the same tasks. It also argues Continental provided "no work product and no explanation" for its invoices. However, Country Mutual has not pointed to—and we have not found—caselaw precluding more than one attorney working on a task or requiring plaintiffs produce work-product evidence to justify already detailed (and in this case, paid) fee invoices. Moreover, Country Mutual did not identify a single duplicative, insufficiently described, or otherwise deficient entry. *See Abellan*, 948 F.3d at 836 ("[The defendant] does not challenge the specifics of [the plaintiff's] attorneys' hours expended or hourly rates."). As such, Country Mutual's unsubstantiated challenges to Continental's evidence are unavailing.

After discussing the evidence supporting Continental's fee request, the district court proceeded to discuss the many factors Illinois law requires courts to consider when assessing the reasonableness of attorney's fees. Specifically, it highlighted "the skill of the lawyers … [and] usual charges for similar services." *See id.* at 835. Given the length of the litigation prior to this lawsuit, Continental retained two firms over more than five years. It hired an experienced litigator at Heyl, Royster, Voelker & Allen, P.C., who accumulated fees of $20,466.94 for representation from May 2013 to July 2015. The court noted that Heyl Royster's rates were "in line with, and arguably lower than, the usual and customary rates charged by attorneys in this jurisdiction." Continental later transferred Hamel Fire's defense to two experienced trial lawyers at Mulherin, Rehfeldt & Varchetto, P.C., who amassed fees of $180,010.30 for their representation of Hamel Fire from April 2015 until all the underlying lawsuits were dismissed by October 2018. These fees, too, were based on Mulherin's customary and reasonable hourly rates for partners and associates.

Further, the court addressed the labor involved, benefit to the client, and complexity of the case. *See Kaiser*, 518 N.E.2d at 428. To that end, the court noted the extensive efforts demanded of Continental's lawyers for the underlying lawsuits with two persisting for nearly six years and a third for more than three years. As the court noted, those matters "involved significant discovery and motion practice, mediation, extensive review of medical records, and accident reconstruction services."

As to the "degree of responsibility required" of the lawyers, *id.*, the district court noted how the retained lawyers "took on full responsibility in the management of the

[underlying lawsuits], including litigation strategy and dis-covery." Likely attributable to hard work of its lawyers, the court also acknowledged that "Hamel Fire reaped significant benefits from the defense provided," another factor suggest-ing the reasonableness of the fees. *Abellan*, 948 F.3d at 835. In fact, Hamel Fire had been released from each of the underly-ing lawsuits and avoided having to pay significant contribu-tions to the settlements in those suits. Country Mutual does not expressly challenge these findings.

Finally, as to complexity, *Kaiser*, 518 N.E.2d at 428, the court acknowledged that the underlying lawsuits were "more complex than a typical motor vehicle collision case" because there were substantial injuries that "required significant med-ical record review and analysis, several depositions, and fo-rensic accident reconstruction," and because of the compli-cated interplay between the private individuals, insurers, and municipal entities involved. Based on potential monetary im-pact alone, the sizable liability in question elevated this to a high-stakes case. On appeal, Country Mutual baldly asserts there was "nothing complex" about vicarious liability for "the operator of a vehicle involved in an automobile accident." Country Mutual, however, fails to specifically address any of the district court's considerations. At a minimum, Country Mutual has not explained why the court abused its discretion in appreciating the above complexities.

Based on the district court's comprehensive examination of the Illinois factors relevant to attorney's fees and defense costs, and Country Mutual's advancement of weak argu-ments to challenge this analysis, we hold the district court did not abuse its discretion and affirm the district court's award of $240,146.18 in attorney's fees and defense costs. As Country

Mutual makes no challenge to the district court's award of pre-judgment interest of $10,394.72, we affirm the district court's entire award of $250,540.90.

### III.  Conclusion

For these reasons, we AFFIRM the district court's entry of summary judgment for Continental and award of attorney's fees, defense costs, and prejudgment interest.